**KNEVELBAARD DAIRIES**, a general partnership consisting of John Knevelbaard and Sam Knevelbaard, general partners, Plaintiffs–Appellants,

v.

**KRAFT FOODS, INC.**, a Delaware corporation; Alpine Lace Brands, Inc., a Delaware corporation; Borden, Inc., a New Jersey corporation; the National Cheese Exchange, a Wisconsin corporation, Defendants–Appellees.

No. 99–55327.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 2000

Filed Dec. 1, 2000

James Robert Noblin, Blecher & Collins, Los Angeles, California, for the plaintiffs-appellants.

James M. Harris, Michael C. Kelley, Sidley & Austin, Los Angeles, California, for defendants-appellees Alpine Lace Brands, Inc., and Borden, Inc.; Thomas F. Ryan and Bruce M. Zessar, Sidley & Austin, Chicago, Illinois, for defendants-appellees, Borden, Inc.

Before: REINHARDT and PAEZ, Circuit Judges, and DWYER,[1] District Judge.

Opinion by Judge DWYER; Dissent by Judge PAEZ.

DWYER, District Judge:

## I. INTRODUCTION

In this antitrust case originally brought in state court under the Cartwright Act, Cal. Bus. & Prof.Code §§ 16700–16770, the plaintiff milk producers[2] claim that the defendant cheese makers[3] conspired successfully to depress the prices they paid for milk produced in California. The alleged price fix among buyers was accomplished in an unusual way: through a now-defunct auction agency called the National Cheese Exchange ("NCE"), the cheese makers are said to have rigged the price for bulk cheese in order to depress their acquisition costs both for that commodity and for milk. California milk prices were targeted and restrained in that the NCE bulk cheese price "determined the cost of fluid milk." That allegation, as the parties' briefs confirm, means that the California Department of Food & Agriculture ("CDFA") used the reported NCE bulk cheese price in its formula for setting the "support" (i.e., minimum) price for milk produced in that state. Thus, the alleged price-fixing that controlled the NCE bulk cheese price was intended to, and did, depress the California milk price as well. The milk producers claim that as a result they received less for their product than they would have received but for the unlawful price restraint. The cheese makers removed the case to federal court on the basis of diversity jurisdiction, see 28 U.S.C. § 1332, and then moved pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss for failure to state a claim on which relief could be granted. The district court, without hearing argument, issued a one-line order granting the motion to dismiss, and the milk producers filed a timely notice of appeal. Finding that this court has jurisdiction, and that the complaint adequately states claims under California law, we reverse and remand except as to one claim that has been abandoned.

1. Honorable William L. Dwyer, Senior United States District Judge for the Western District of Washington, sitting by designation.

2. The plaintiffs are Knevelbaard Dairies, a general partnership, and John and Sam Knevelbaard. They sue for themselves and a putative class of others similarly situated. We express no opinion as to whether a class should be certified pursuant to Fed.R.Civ.P. 23.

3. The defendants are Kraft Foods, Inc. ("Kraft"), Alpine Lace Brands, Inc., and Borden, Inc. The district court dismissed the action as to a fourth defendant, National Cheese Exchange, for lack of personal jurisdiction; the milk producers have expressly waived any appeal from that order.

## II. JURISDICTION UNDER 28 U.S.C. § 1291

This court has jurisdiction of appeals from "all final decisions" of the district court. 28 U.S.C. § 1291. No party has argued that jurisdiction is absent, but we must address the issue *sua sponte.* *WMX Technologies, Inc. v. Miller,* 104 F.3d 1133, 1135 (9th Cir.1997) (en banc).

■■■ The cheese makers' motion in the district court was styled a motion to dismiss "the complaint" rather than "the action." An order granting such a motion must be accompanied by leave to amend unless amendment would be futile. *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000). No such leave was granted here. "Ordinarily an order dismissing the complaint rather than dismissing the action is not a final order and thus not appealable. However, '[i]f it appears that the district court intended the dismissal to dispose of the action, it may be considered final and appealable.' *Hoohuli v. Ariyoshi,* 741 F.2d 1169, 1171 n. 1 (9th Cir.1984)." *Gerritsen v. de la Madrid Hurtado,* 819 F.2d 1511, 1514 (9th Cir.1987). *Accord Martinez v. Gomez,* 137 F.3d 1124, 1125 (9th Cir.1998) ("[I]t is clear that there is nothing further [the plaintiff] can do and the district court must have intended this order to end the case. Therefore, we treat the dismissal as a final order.").

■■■ The record here shows that the district court intended its order to end the case. Although the cheese makers sought dismissal of the complaint, they repeatedly argued that the plaintiffs not only did not, but "cannot," allege essential parts of an antitrust or unfair competition claim. The milk producers opposed the motion on the merits and, in the alternative, asked leave to amend "unless it is determined that no possible amendment would cure the com-

plaint's deficiencies." The district court's order reads simply: "It is Ordered that the motions to dismiss be, and hereby are, Granted." This ruling necessarily entailed a denial of the alternative request for leave to amend and a determination, in the words of *Lopez,* 203 F.3d at 1127, "that the pleading could not possibly be cured by the allegation of other facts." Thus the district judge must have intended the dismissal order to end the case.

We have so held in several earlier cases. In *Gerritsen* we said: "Failure to allow leave to amend supports an inference that the district court intended to make the order final. Furthermore, the court's intention of finality is evinced by its apparent conclusion that amendment of the complaint would not save the action." 819 F.2d at 1514 (citations omitted). *Accord Hoohuli,* 741 F.2d at 1171, n. 1; *Martinez,* 137 F.3d at 1125–26; *Scott v. Eversole Mortuary,* 522 F.2d 1110, 1112 (9th Cir. 1975).

The inference that finality was intended is especially strong here in light of the milk producers' explicit request for leave to amend unless the court determined that no possible amendment would avoid dismissal. No one has suggested an amendment that could change the district court's ruling.

Also probative is the understanding of the district court clerk that a final dismissal was ordered. The clerk's docket entry describes the dismissal order as "terminating case." A "JS–6" stamp on the order shows that the clerk reported the case as terminated to the Administrative Office of the United States Courts. *See* District Court Clerks Manual § 4.09b. The parties' understanding has been the same, as reflected in their briefs on appeal.[4]

4. The milk producers say: "The district court demonstrated its intent to issue an appealable dismissal by directing that it be entered pursuant to the rule governing entry of judgments. *See Martinez v. Gomez,* 137 F.3d 1124, 1126 (9th Cir.1998) (order of dismissal appealable when district court intended it to end the action)." The cheese makers say:

"The district court dismissed this action on December 4, 1998." They conclude: "Nor could any amendment consistent with Knevelbaard's core allegations possibly cure the deficiencies in its complaint. Accordingly, for the reasons set forth above, the district court's decision to dismiss Knevelbaard's case with prejudice should be affirmed."

We conclude that the district court intended its order to be a final dismissal. Accordingly, this court has jurisdiction on appeal under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

■ We review *de novo* the district court's order of dismissal for failure to state a claim. *See Wyler Summit Partnership v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir.1998). A motion to dismiss for failure to state a claim may not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on such a motion, "the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the non-moving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). The complaint need not set out the facts in detail; what is required is a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a); *La Salvia v. United Dairymen*, 804 F.2d 1113, 1116 (9th Cir.1986). Antitrust cases are not to be judged by a higher or different pleading standard than other cases. *See Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir.1980). An antitrust plaintiff "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Cost Management Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir.1996) (quoting *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir.1987)).

## IV. ALLEGATIONS OF THE COMPLAINT

The complaint sets out three claims. The first, naming all defendants, alleges a combination in restraint of trade in violation of the Cartwright Act, Cal. Bus. & Prof.Code § 16720. The second, also naming all defendants, alleges that the combination in restraint of trade, and acts done pursuant to it, violated the Unfair Competition Act, Cal. Bus. & Prof.Code § 17200. The third, naming Kraft only, alleges that Kraft violated the Unfair Competition Act by monopolizing and attempting to monopolize.

■ The third claim is deemed abandoned because the milk producers have not opposed its dismissal in their briefs and argument to this court. *See* Fed. R.App. P. 28(a)(9)(A) (requiring that the appellant's brief contain "appellant's contentions and the reasons for them"). *See also Essery v. Department of Transp.*, 857 F.2d 1286, 1288 n. 1 (9th Cir.1988) ("Nowhere does [appellant] argue that the [agency] erred in finding that he violated Sections 91.79(a) and (b).... That issue is therefore deemed abandoned."). The first and second claims are at issue in this appeal.

For present purposes, the key allegations of the complaint are as follows: The plaintiff milk producers are "residents and citizens of California who have sold milk directly or indirectly to one or more of the defendants"; the defendant cheese makers purchase bulk cheese and milk for use in their products; NCE, in Wisconsin, operated the only national cash auction market for bulk cheese; the cheese makers "purchased substantial quantities of milk from plaintiffs and the members of the class, either directly or indirectly"; the cheese makers "did not compete and ... instead acted together to suppress the cost of milk purchased by them from plaintiffs and the members of the class"; "[b]y collusively manipulating NCE prices to levels lower than would prevail under conditions of free and open competition, [the cheese makers] lowered their procurement costs for bulk cheese bought off the NCE pursuant to NCE-based formula prices"; the NCE prices "determined the cost of fluid milk used by Kraft in its cheese plants"; the cheese makers formed a combination "in unreasonable restraint of trade and commerce" in violation of the Cartwright Act; the terms of the unlawful combination included "depressing, fixing, pegging,

stabilizing and maintaining prices paid for milk used in the manufacture of cheese"; as an intended result "prices paid by the defendants and their co-conspirators for milk were fixed, depressed, maintained and stabilized at artificially low and at non-competitive levels"; "competition for the purchase of milk in California was unreasonably restrained"; the cheese makers "have been unjustly enriched as a result of their wrongful conduct and ... unfair competition"; and the plaintiffs and class members "received less for milk than they otherwise would have received in the absence of the defendants' unlawful conduct."

The complaint details how the cheese makers allegedly did these things. The milk producers seek treble damages, an injunction, and other relief.

## V. SUFFICIENCY OF THE COMPLAINT

In the absence of a statement by the district court of reasons for the dismissal, the cheese makers on appeal raise a variety of arguments. They contend that the complaint fails to plead antitrust injury and antitrust standing as required by the Cartwright Act; that relief is barred by the filed rate doctrine; that the Commerce Clause precludes application of California's antitrust statute in this context; and that the milk producers' related claims under the state's unfair competition statute also must be dismissed. We consider these arguments in light of the rules, summarized above, governing motions to dismiss for failure to state a claim.

### A. Cartwright Act and Sherman Act

The Cartwright Act, adopted in 1907, and the Sherman Act, adopted in 1890, have in common the goal of prohibiting trade-restraining combinations and monopolies and thereby preserving competition. The federal statute's purpose is stated in *Northern Pacific Railway v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958):

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition.

The California statute's goal is described in *Exxon Corp. v. Superior Court*, 51 Cal. App.4th 1672, 1680, 60 Cal.Rptr.2d 195 (1997):

> The Cartwright Act (Bus. & Prof.Code, § 16700 et seq.), as the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.

There are, however, differences in statutory wording and legislative history that lead, in some respects, to different results. In *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal.3d 1147, 1164, 252 Cal.Rptr. 221, 762 P.2d 385 (1988), the court held:

> Admittedly, in past statements we have suggested that the Cartwright Act is patterned after the Sherman Act. As shown above, however, historical and textual analysis reveals that the Act was patterned after the 1889 Texas act and the 1899 Michigan act, and not the Sherman Act. Hence judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent, given the different genesis of the provision under review.

■ Thus, federal antitrust precedents are properly included in a Cartwright Act analysis, but their role is limited: they are "often helpful" but not necessarily decisive.

## B. Buyers' Price–Fixing Combinations as Per Se Violations

The Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. The Cartwright Act prohibits, among other things, any combination "[t]o prevent competition in [the] sale or purchase of ... any commodity" or to "[a]gree in any manner to keep the price of ... [any] commodity ... at a fixed or graduated figure." Cal. Bus. & Prof.Code § 16720(c) and (e)(2).

Under both statutes, certain types of collusive conduct are held to be so destructive of competition, and so devoid of redeeming value, that they are conclusively presumed to be unreasonable—i.e., they are per se violations. *See Northern Pac. Ry.,* 356 U.S. at 5, 78 S.Ct. 514; *People v. Santa Clara Valley Bowling Proprietor's Ass'n,* 238 Cal.App.2d 225, 235, 47 Cal. Rptr. 570 (1965).

Foremost in the category of per se violations is horizontal price-fixing among competitors. This long-established rule was explained by the Supreme Court in *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700 (1927): "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." *See also NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). "Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *NCAA v. Board of Regents,* 468 U.S. 85, 107–08, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

 The same rule applies in California: "Under both California and federal law, agreements fixing or tampering with prices are illegal per se." *Oakland–Alameda County Builders Exch. v. F.P. Lathrop Constr. Co.,* 4 Cal.3d 354, 363, 93 Cal.Rptr. 602, 482 P.2d 226 (1971).

The California statute explicitly makes price fixing by buyers unlawful. *See* Cal. Bus. & Prof.Code § 16720(c) (prohibiting any combination to prevent competition in the "sale *or purchase* of any commodity" (emphasis added)). The federal decisional law, based on a more generally worded statute, reaches the same result. *See United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("A combination formed for the purpose and with the effect of raising, *depressing,* fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.") (emphasis added); *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 235, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) ("It is clear that the agreement is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers."). *See also Harkins Amusement Enters., Inc. v. General Cinema Corp.,* 850 F.2d 477, 487 (9th Cir.1988) ("Concerted action to eliminate competitive bidding violates the Sherman Act.").

When a per se violation such as horizontal price fixing has occurred, there is no need to define a relevant market or to show that the defendants had power within the market. *See, e.g., FTC v. Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 435–36 & n. 19, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). The California Supreme Court has held, under the Cartwright Act, that competitors who agree to fix prices are liable under the per se rule "[e]ven though the members of the price-fixing group were in no position to control the market." *Mailand v. Burckle,* 20 Cal.3d 367, 376, 143 Cal.Rptr. 1, 572 P.2d 1142 (1978) (quoting *Socony–Vacuum Oil Co.,* 310 U.S. at 221, 60 S.Ct. 811).

The cheese makers cite *In re Beef Industry Antitrust Litigation,* 907 F.2d 510 (5th Cir.1990), for the proposition that the milk producers' claims must fail for lack of a showing that the cheese makers had the power to suppress total industry demand for milk, not just their own demand. The court there, noting that the alleged conspirators were only two of the four major buyers of cattle, described the plaintiffs'

theory as "economically unfeasible," and said that

> [a]ny attempt at conspiracy between only two of those packers to depress fed cattle prices could not succeed, because the other packers, especially the other two major competitors, could raise their own fed cattle prices a small amount, effectively buy away the fed cattle that had previously been the source of sales to [the defendants].

*Id.* at 516. We need not decide whether *In re Beef* is consistent with controlling Supreme Court precedent or California law because the case is inapposite. First, the court there found that the plaintiffs had failed to submit sufficient proof of a conspiracy, *id.* at 514, a question not involved in the present Rule 12(b)(6) motion. Second, there was no allegation that the defendant cattle purchasers were able to, and did, concertedly depress a statewide commodity price by manipulating a minimum price formula. That claim here is exactly contrary to the *In re Beef* holding that the alleged conspiracy "could not succeed." According to the present complaint, the conspiracy had the means to, and did, succeed.

## C. Antitrust Standing

■ Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Despite the apparent breadth of the phrase "any person," the Supreme Court has held that Congress did not intend to afford a remedy to everyone injured by an antitrust violation simply on a showing of causation. The plaintiff must have "antitrust standing." To determine whether that requirement is met, the court must "evaluate the plaintiff's harm, the

alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In *American Ad Management, Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054–55 (9th Cir.1999), this court summarized the factors relevant to antitrust standing as follows: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."

■ Antitrust standing is required under the Cartwright Act. *See Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 723, 187 Cal.Rptr. 797 (1982). As shown below, however, California law affords standing more liberally than does federal law.

### (a) Antitrust Injury

■ The first factor—the "nature of the plaintiff's alleged injury"—requires a showing of "antitrust injury," i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). As this court stated in *American Ad Management*, 190 F.3d at 1055:

> Parsing the Supreme Court's definition, we can identify four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.

■ The complaint here plainly alleges unlawful conduct, i.e., a per se antitrust violation, and that the conduct was intended to and did injure the plaintiffs.[5] Since

---

**5.** The milk producers do not contend that they are exempt from the antitrust injury requirement because the cheese makers committed a per se violation, nor would any such contention be tenable. They argue only that

the plaintiffs allegedly were subjected to artificially depressed milk prices, the injury flows "from that which makes the conduct unlawful," i.e., from the collusive price manipulation itself. The cheese makers argue, however, that the fourth requirement—that the injury be "of the type the antitrust laws were intended to prevent"—is unmet. They say, in substance, that a conspiracy to depress prices would not harm consumers but benefit them, because reduced milk acquisition costs would mean lower cheese manufacturing costs and, therefore, lower prices for cheese products. They contend that "the alleged conduct actually increased competition in the milk market," and that "injury from selling at lower, more competitive prices is simply not enough."

The fallacy of this argument becomes clear when we recall that the central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition—not the collusive fixing of prices at levels either low or high—that these statutes recognize as vital to the public interest. The Supreme Court's references to the goals of achieving "the lowest prices, the highest quality and the greatest material progress," *Northern Pac. Ry.*, 356 U.S. at 4, 78 S.Ct. 514, and of "assur[ing] customers the benefits of price competition," *Associated Gen.*, 459 U.S. at 538, 103 S.Ct. 897, do not mean that conspiracies among buyers to depress acquisition prices are tolerated. Every precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is what will benefit consumers. "[O]ur prior cases," the Court noted in *Associated General*, "have emphasized the central interest in protecting the economic freedom of participants in the relevant market." 459 U.S. at 538, 103 S.Ct. 897. In California, similarly, "The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces

of supply and demand." *Speegle v. Board of Fire Underwriters*, 29 Cal.2d 34, 44, 172 P.2d 867 (1946).

■ The cheese makers' argument also confuses vertical price fixing (e.g., resale prices imposed by a manufacturer on its distributors) with horizontal price fixing (collusive price setting or stabilization by competitors). Under federal law, vertical arrangements that set minimum prices are illegal per se while those that set maximum prices are tested under the rule of reason and may or may not be deemed to have anticompetitive consequences. *See State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Horizontal price fixing is a per se violation regardless of whether the prices set are minimum or maximum. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). The defendants rely largely on cases that involved claims by competitors—a category much different from that of claims between buyers and sellers. When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs. This is seen most often in claims by overcharged buyers; as to underpaid sellers it is less common in the reported cases, but is equally true. As stated in a leading text, 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 375b at 297 (rev. ed.1995):

> When buyers agree illegally to pay suppliers less than the prices that would otherwise prevail, suppliers are obviously injured in fact. The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels—namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices.

Most courts understand that a buying cartel's low buying prices are illegal and

once a per se violation is proved they need not show market power, and in that they are

correct (*see supra* Section V.B.); they still must prove injury in fact and antitrust injury.

bring antitrust injury and standing to the victimized suppliers. Clearly mistaken is the occasional court that considers low buying prices pro-competitive or that thinks sellers receiving illegally low prices do not suffer antitrust injury.

To hold otherwise would be contrary to long-established antitrust law.[6]

■ Antitrust injury requires that the "injured party be a participant in the same market as the alleged malefactors." *American Ad Management*, 190 F.3d at 1057 (quoting *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir.1985)). The defendants here contend that they are in one market (cheese) while the plaintiffs are in another (fluid milk). But the complaint's allegations unmistakably place all parties in the milk market—the defendants as buyers and the plaintiffs as sellers—and even have them transacting business with each other. For present purposes those allegations must be accepted as true. ·

**(b) Directness of the Injury**

■ The plaintiffs must prove injury in fact, and the claimed injury must be sufficiently direct. Under federal law, there must be "not a mere causal link, but a direct effect." *City of Pittsburgh v.*

*West Penn Power Co.*, 147 F.3d 256, 268 (3d Cir.1998) (not direct where there was "no way to determine whether the rates the city will pay for electric service are or will be affected by the alleged actions"). To assess the directness of the plaintiff's injury, the court "look[s] to the chain of causation between [plaintiff's] injury and the alleged restraint in the market." *American Ad Management*, 190 F.3d at 1058.

■ The cheese makers argue that the milk producers were free to sell their milk to others at higher prices than the minimum levels set by the CDFA. But that argument merely denies that the plaintiffs were damaged in fact. It does not speak to the complaint, which alleges that the plaintiffs *were* damaged when the defendants fixed milk prices at artificially low levels and thereby caused plaintiffs to "receive[ ] less for milk than they otherwise would have received in the absence of the defendants' unlawful conduct." These disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion.

■ The defendants also contend that since the market allegedly restrained was that for cheese, and the milk support price was set by a state agency, the chain of causation is too tenuous to support re-

---

**6.** *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), cited by the cheese makers, is plainly inapplicable. In *American Ad Management*, 190 F.3d at 1056, we described that case as follows:

Due to the vagaries of the bowling industry, Brunswick, a large bowling equipment manufacturer, had become "by far the largest operator of bowling centers" in the country. *Brunswick*, 429 U.S. at 480, 97 S.Ct. 690. Pueblo challenged Brunswick's acquisition of some of Pueblo's competitors who were on the verge of bankruptcy. Pueblo alleged that the acquisitions threatened to create a monopoly, given Brunswick's market power. Pueblo's claimed injury was the additional profit it would have earned had its competitors been allowed to fold. *See id.* at 479–80, 97 S.Ct. 690. The Supreme Court held that Pueblo's claimed injury did not flow from the illegality of Brunswick's conduct. If the acquisitions

violated § 7, it was only because the acquisitions "brought a 'deep pocket' parent into a market of 'pygmies.'" *Id.* at 487, 97 S.Ct. 690. Pueblo's injuries, however, were unrelated to Brunswick's potential to monopolize, that which made the acquisition potentially unlawful. Any rescue of the troubled centers would injure Pueblo in the same way.

*Atlantic Richfield Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333, involved a vertical maximum price arrangement. A gasoline retailer complained that low retail prices imposed by an oil company on its dealers, competitors of the plaintiff, were depriving the plaintiff of business. The Court held that the claimed injury did not stem "from a competition-reducing aspect or effect of the defendants' behavior." Here, in contrast to these and other cases cited by defendants, the claimed injury flows directly from that which makes the defendants' conduct unlawful.

covery. But that too overlooks what the complaint says—that the defendants were buyers in the milk market, that they conspired to depress the price of milk produced in California, and that they did so by rigging the NCE bulk cheese price at artificially low levels. According to these allegations, the NCE price was a tool used by the conspirators to manipulate the California milk price. The result for purposes of antitrust injury analysis should be no different than if the cheese makers had conspired to report a fictitious NCE price in order to depress the milk price, which clearly would cause direct injury to the milk producers. *See Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1296 (5th Cir.1971) (summary judgment reversed where oil producers allegedly conspired to report false production data to state agency so as to increase production allowance);[7] *City of Long Beach v. Standard Oil*, 872 F.2d 1401, 1408 (9th Cir.1989) (injury sufficiently direct notwithstanding federal price ceilings where ceilings allegedly were based on artificially low procurement prices collusively posted by defendants). Here, as in *City of Long Beach*, the defendants allegedly conspired successfully to subject the plaintiffs (their suppliers) to artificially low prices by reporting fixed prices to an agency. As the Supreme Court has stated, "the machinery employed by a combination for price-fixing is immaterial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).[8]

That the alleged conspiracy restrained prices for two commodities—bulk cheese and milk—would not immunize the defendants against antitrust claims. The milk sellers, insofar as the alleged conspiracy was meant to and did reduce their sales prices, suffered a direct injury. Antitrust violations frequently entail multiple means and objectives (e.g., restraining both purchase prices and sales prices or boycotting to enforce price stabilization). *See, e.g., FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990); *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1221 (7th Cir.1993); *Ancar v. Sara Plasma, Inc.*, 964 F.2d 465 (5th Cir.1992). The law requires that every conspiracy be judged as a whole. This important rule was stated in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (citations and internal quotations omitted):

> In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and

---

7. Other cases holding that antitrust claims may be pursued by parties injured as the result of the knowing and collusive submission of false information to a government agency include *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1261 (9th Cir.1982); *Israel v. Baxter Labs.*, 466 F.2d 272 (D.C.Cir.1972); *Outboard Marine Corp. v. Pezetel*, 474 F.Supp. 168 (D.Del.1979); and *Litton Sys. v. AT & T*, 487 F.Supp. 942, 956 (S.D.N.Y.1980) ("The system of administrative supervision is not undercut but is complemented and reinforced by affording judicial relief for cynical evasion or corruption of that system for unfair competitive advantage").

8. To constitute horizontal price fixing, the agreement among competitors need not involve the ultimate price. In *Socony-Vacuum*, the Court condemned a concerted program by oil companies to purchase surplus gasoline on the spot market to prevent prices from falling, noting that even if the conspirators "were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." 310 U.S. at 221, 60 S.Ct. 811. *See also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (agreement to standardize credit terms "falls squarely within the traditional *per se* rule against price fixing"); *Plymouth Dealers' Ass'n v. United States*, 279 F.2d 128 (agreement to use standard trade-in allowances); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F.Supp. 869 (E.D.Cal.1986) (use of standardized cooling and pelletizing charge).

viewing its separate parts, but only by looking at it as a whole. *Accord Beltz Travel Serv. v. International Air Transport Ass'n,* 620 F.2d 1360, 1366–67 (9th Cir.1980). Thus, where a plaintiff is injured by one facet of a multi-faceted conspiracy he is entitled to damages regardless of whether the other facets of the defendants' collusion had any economic impact on him. *Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc.,* 356 F.2d 371 (9th Cir.1966).

The extent to which antitrust injury is recognized under the Cartwright Act is enlarged, by statute, in comparison to federal law. The Act provides, at Calif. Bus. & Prof.Code § 16750(a) (emphasis added):

> Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor ... to recover three times the damages sustained by him or her....

> This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured person dealt directly or indirectly with the defendant.*

■ The last clause was added by the California legislature following the Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which limited the ability of indirect purchasers to recover damages under the Sherman and Clayton Acts. As a result, "the more restrictive definition of 'antitrust injury' under federal law does not apply" to the Cartwright Act.

*Cellular Plus, Inc. v. Superior Court,* 14 Cal.App.4th 1224, 1234, 18 Cal.Rptr.2d 308 (1993). The *Cellular Plus* court, affording standing to agents who allegedly lost sales due to prices having been artificially inflated by their principals' price-fixing, said that "[t]he exact parameters of 'antitrust injury' under section 16750 have not yet been established" but that "the scope of that term is broader" than under federal law. *Id.*[9]

**(c) Speculative Nature of Harm**

■ The cheese makers argue that because other factors influence milk prices, the harm to plaintiffs is speculative. *See Associated Gen. Contractors,* 459 U.S. at 542, 103 S.Ct. 897 ("Partly because the alleged effects on the [plaintiff] may have been produced by independent factors, the [plaintiff's] damages claim is also highly speculative."). This argument fails in light of the complaint's allegation that the rigged NCE price controlled the price of fluid milk produced in California. Whether experts will be able to measure the difference between the allegedly restrained price for milk and the price that would have prevailed but for the antitrust violation remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative.

**(d) The Risk of Duplicative Recovery**

■ There appears to be no risk of this nature. The allegedly underpaid plaintiffs sustained the injury. The cheese makers

---

9. The complaint alleges that the plaintiffs "sold milk directly or indirectly *to one or more of the defendants*" and that the putative class is composed of "all persons who reside in the State of California and who sold milk, directly or indirectly, *to any of the defendants* during the period from January 1, 1988, to April 1997." (Emphasis added.) The parties have not briefed, and we need not decide, whether milk sellers who sold to non-conspirator buyers, at prices claimed to be artificially low because of the market effects of defendants' conspiracy, would have standing to seek dam-

ages from defendants. There is a split of authority on that subject. *See, e.g., In re Arizona Dairy Products Litigation,* 627 F.Supp. 233, 235–36 (D.Ariz.1985) (standing granted); *In re Copper Antitrust Litigation,* 98 F.Supp.2d 1039 (W.D.Wis.2000) (standing granted); *FTC v. Mylan Lab., Inc.,* 62 F.Supp.2d 25, 38–39 (D.D.C.1999) (standing denied); *Gross v. New Balance Athletic Shoe, Inc.,* 955 F.Supp. 242, 245 (S.D.N.Y.1997) (standing denied); and the cases collected at ABA Section of Antitrust Law, *Antitrust Law Developments* 779 n. 128 (4th ed.1997).

have not suggested anyone else who could sue to recover damages for the underpayment.

### (e) Complexity in Apportioning Damages

■ This factor comes into play when multiple classes or layers of claimants seek, or might seek, compensation. It is totally absent here.

In summary, all elements of antitrust standing are satisfied on the face of the present complaint.

## D. The Filed Rate Doctrine

California has a regulatory scheme for the marketing of milk. The legislature determined that it was "essential to establish minimum producer prices at fair and reasonable levels so as to generate reasonable producer incomes that will promote the intelligent and orderly marketing of market milk ... and that minimum producer prices established [by the director of the CDFA (the 'Director')] should not be unreasonably depressed because other factors have affected the levels of retail prices paid by consumers." Cal. Food & Agric. Code § 61802(h). To achieve these ends the Director is authorized "to prescribe marketing areas and to determine minimum prices" to be paid to milk producers. Cal. Food & Agric. Code § 61805. Between 1989 and 1997, the period of claimed injury to the plaintiffs, the Director used the NCE bulk cheese price as part of a formula to compute the minimum price of milk in California. By rigging the NCE price, according to the complaint, the cheese makers artificially depressed the minimum price for milk, to plaintiffs' damage. The cheese makers now argue that the filed rate doctrine requires dismissal of the action.

■ The filed rate doctrine originated in *Keogh v. Chicago & Northwestern Railway*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), where the Court held that a private shipper could not recover treble damages against railway companies that had set uniform rates duly filed with,

and approved by, the Interstate Commerce Commission. Two rationales were offered. First, the regulatory scheme allowed the recovery of damages for illegal rates in proceedings before the ICC; Congress presumably would not have intended a second remedy. Second, carrier rate regulation was primarily intended to prevent the charging of discriminatory rates, an objective which would be disserved by affording antitrust recovery to some shippers but not all. Although the doctrine has been questioned by many including the Supreme Court itself, it lives on to a limited extent. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *MCI Telecommunications Corp. v. AT & T Co.*, 512 U.S. 218, 234, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). Where damages are sought under the federal antitrust laws, the doctrine may preclude relief if the challenged rates or prices were set by either federal or state regulatory authorities. *See Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994). Where damages are sought under a state law, it may apply if the challenged rates or prices were set by a federal regulatory authority. *See, e.g., Duggal v. G.E. Capital Communications Serv.*, 81 Cal.App.4th 81, 87–88, 96 Cal.Rptr.2d 383 (2000); *County of Stanislaus v. Pacific Gas & Elec. Co.*, 114 F.3d 858, 866 (9th Cir.1997) ("[T]he filed rate doctrine bars *all* claims—state and federal—that attempt to challenge a rate that a federal agency has reviewed and filed.")

■ This case, however, involves only a *state* antitrust law being applied where an *agency of that state* has set a commodity price that, according to the complaint, was wrongfully depressed by manufacturers who collusively manipulated data submitted to and used by the agency. Whether damages can be awarded to the injured parties is a matter of state law. California has held, in contrast to federal law, that no filed rate doctrine exists as a bar. In *Cellular Plus, Inc., v. Superior Court*, 14 Cal.App.4th 1224, 18 Cal.Rptr.2d 308

(1993), the defendant telephone service providers contended that the filed rate doctrine shielded them because the prices they charged for service—prices which the plaintiffs claimed were the result of a horizontal price-fixing conspiracy—had been filed with and approved by the California Public Utilities Commission. *Id.* at 1240, 18 Cal.Rptr.2d 308. The state court agreed that the filed rate doctrine would avail defendants if it applied, but held that under the Cartwright Act no such doctrine would bar recovery:

> [W]e find no compelling underlying logic or policy reasons for denying a Cartwright Act cause of action for treble damages to a person injured by reason of a price fixing conspiracy, even if the fixed prices had been approved as reasonable by a regulatory agency.

*Id.* at 1241–42, 18 Cal.Rptr.2d 308.

The *Cellular Plus* court set out a number of reasons for not following *Keogh* and *Square D, see* 14 Cal.App.4th at 1242, 18 Cal.Rptr.2d 308, and concluded that to deny standing would "implicitly ... encourage[ ] regulated companies to engage in anticompetitive price fixing activities." *Id.* at 1243, 18 Cal.Rptr.2d 308. While the facts alleged here differ in some respects from those asserted in *Cellular Plus*, there is no reason to think that California would apply the filed rate doctrine that it has so clearly rejected. As we noted in *County of Stanislaus*, 114 F.3d at 866, "*Cellular Plus* merely declined to create a state filed rate doctrine where rates filed with the [state agency] were not subject to federal review." [10]

In a related argument, the cheese makers contend that the Director in 1989 and 1995 considered and rejected claims that the NCE bulk cheese price was rigged. The milk producers agree that the Director decided to keep the NCE price in the California minimum milk price formu-

la, but deny that he exonerated the defendants or made any findings that would permit or justify price-fixing. This dispute, like others raised by the parties, has no place in deciding a motion under Rule 12(b)(6). We express no opinion as to the merits of the argument because, however it might be resolved at a later stage, it cannot support a dismissal for failure to state a claim.

### E. The Commerce Clause

The cheese makers argue that the milk producers' action, if allowed to proceed, would run afoul of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. But the Supreme Court has made clear that neither the Sherman Act nor the Commerce Clause preempts state antitrust laws. *See, e.g., California v. ARC Am. Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). On point is *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), which concerned a Maryland statute designed to foster competition by requiring oil refiners to divest themselves of retail service stations and charge a uniform price to all stations they supplied. *Id.* at 121–22, 98 S.Ct. 2207. The refiners challenged the statute, arguing that the Commerce Clause precluded enforcement of the Maryland statute because the refiners were out-of-state companies whose out-of-state transactions should not be subjected to regulation by a state in which no refiners were located. The Supreme Court rejected the argument and upheld the right of states to apply their competition statutes unless lack of uniformity would impede the flow of goods. There is nothing to suggest that application of the Cartwright Act to prevent price-fixing by buyers of California milk would impede the flow of goods. The conduct complained of took place not only in Wisconsin, where NCE was locat-

---

**10.** The cheese makers' reliance on *Day v. AT & T Corp.,* 63 Cal.App.4th 325, 74 Cal.Rptr.2d 55 (1998), is misplaced. That case involved rates filed with the Federal Communications Commission. *See id.* at 337, 74 Cal.Rptr.2d 55 ("The net effect of imposing any monetary sanction on the respondents will be to effectuate a rebate, thereby resulting in discriminatory rates. As we have seen, this is a matter which is strictly of federal concern under the [Federal Communications] Act, and is, therefore, barred by the filed rate doctrine.").

ed, but in California, where the cheese makers allegedly purchased milk at prices artificially depressed by their combination in restraint of trade. That being so, California may apply its antitrust and unfair competition statutes consistent with the Commerce Clause.[11]

### F. Unfair Competition Claim

The milk producers' unfair competition claim is brought under California's Unfair Competition Act, Cal. Bus. & Prof.Code § 17200, which prohibits "any unlawful, unfair or fraudulent business act or practice." The cheese makers contend that because the antitrust claim must be dismissed, the unfair competition claim must fail as well because any finding of unfairness must be "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 186–87, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). The argument must be rejected for three reasons:

First, the quoted statement in *Cel–Tech* was limited to claims of "unfairness to competitors," a category of cases unlike the case at bar. *Id.*

Second, the argument must fail in any event because the milk producers' antitrust claim survives the present challenge.

Third, a plaintiff may bring an unfair competition claim under California law unless some other provision bars the action by clearly permitting the conduct. *See id.* at 184, 83 Cal.Rptr.2d 548, 973 P.2d 527. The milk producers are not barred

from pursuing their Cartwright Act and Unfair Competition Act claims together.

### VI. CONCLUSION

It bears repeating that we are not concerned with which side will prevail at trial, or even with whether the milk producers' claims will survive summary judgment. The cheese makers' motion under Fed. R.Civ.P. 12(b)(6) tests only whether the complaint's allegations are such that a set of facts within their scope could entitle the plaintiffs to relief. The present complaint satisfies that test.

REVERSED AND REMANDED as to claims one and two; AFFIRMED as to claim three. Plaintiffs/appellants will recover their costs in this court.

PAEZ, Circuit Judge, Dissenting:

I respectfully dissent on two separate grounds. First, I cannot agree with the majority's conclusion that we have jurisdiction over this appeal. The record contains no "final decision" of the district court, as 28 U.S.C. § 1291 requires. Second, even if we did have jurisdiction, I do not agree with the majority that plaintiffs have adequately stated claims for relief under California's Cartwright Act and unfair competition law, California Business and Professions Code §§ 17200 *et seq.* Accepting plaintiffs' allegations as true, as we must under Rule 12(b)(6) of the Federal Rules of Civil Procedure, plaintiffs do not (and cannot) allege any anti-competitive effect resulting from defendants' purported collusion. Accordingly, they fail to state either an antitrust or unfair competition claim under California law.[1] Because

---

11. Cases holding that nondiscriminatory state economic regulation may be imposed despite an impact on interstate commerce are collected at ABA Section of Antitrust Law, *Antitrust Developments*, 745–46 (4th ed.1997).

1. My conclusion regarding the first claim dictates the same result on plaintiffs' second claim for relief for violation of California's unfair competition law, Bus. & Prof.Code §§ 17200 *et seq.* As set forth below, plaintiffs did not allege any anti-competitive effect of defendants' alleged collusion. Plaintiffs remained free to sell their milk at any price

above the support level. The behavior that plaintiffs allege caused the California Department of Food and Agriculture ("CDFA") to set a lower price floor had the effect of increasing the potential number of mutually beneficial transactions between milk buyers and sellers. Under *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Company*, 20 Cal.4th 163, 186, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999), plaintiffs must "tether" their allegations of unfairness to competitors under section 17200 "to some legislatively declared policy or proof of some actual or threatened

I cannot reconcile the majority's analysis of plaintiffs' alleged *per se* horizontal price-fixing scheme with existing state and federal antitrust jurisprudence, I address the nature of plaintiffs' Cartwright Act claim and plaintiffs' failure to allege "antitrust injury," as well as the jurisdictional defect.[2]

I

*Jurisdiction*

Even if the parties do not raise the issue of our jurisdiction, we must. *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1135 (9th Cir.1997) (en banc). This court's jurisdiction is limited to final decisions of the district court. 28 U.S.C. § 1291. To be final for jurisdictional purposes, the district court's ruling must (1) fully adjudicate the issues, and (2) "clearly evidence[ ] the judge's intention that it be the court's final act in the matter." *In re Slimick*, 928 F.2d 304, 307 (9th Cir.1990), *citing United States v. F. & M. Schaefer Brewing Co.*, 356 U.S. 227, 234, 78 S.Ct. 674, 2 L.Ed.2d 721 (1958).

It is well established that an order dismissing a complaint but not the underlying action is not a final order and is not, therefore, appealable. *Wright v. Gibson*, 128 F.2d 865, 866 (9th Cir.1942). Only if the record shows "special circumstances" may this court treat such an order as final and appealable. *Marshall v. Sawyer*, 301 F.2d 639, 643 (9th Cir.1962). Special circumstances exist when the district court has clearly found that "the action could not be saved by any amendment to the complaint which the plaintiff could reasonably be expected to make...." *Id.* at 643 (citations omitted). "If it appears that the district court intended the dismissal to dispose of the action, it may be considered final and appealable." *Hoohuli v. Ariyoshi*, 741 F.2d 1169, 1171 n. 1 (9th Cir.1984); *see also Gerritsen v. de la Madrid Hurta-*

*do*, 819 F.2d 1511, 1514 (9th Cir.1987) (finding order's failure to grant plaintiff leave to amend supportive of an inference that district court intended to make the order final); *but see State of California v. Harvier*, 700 F.2d 1217, 1218 (9th Cir.1983) (no "special circumstances" where district court did not preclude appellant from filing amended complaint and ambiguous colloquy did not demonstrate that district court believed no amendment could save complaint).

The district court's Order of December 11, 1998 was brief:

The Court has considered defendants' motions to dismiss, together with the moving and opposing papers. It is Ordered that the motions to dismiss be, and hereby are, Granted.

The district court plainly did not dismiss the entire action. By its terms, the Order is not final and appealable.

The Order, however, bears several stamps. In addition to those stating "filed" and "entered," one is a checklist of four items: "Docketed," "Mld copy Ptys," "Mld Notice Ptys," and "JS–6." The fourth item refers to the JS–6 Termination Report that enables the clerk's office to report monthly to the Administrative Office of the U.S. Courts on the number and type of cases the court has terminated. *See* District Court Clerks Manual § 4.09b. Under the Federal Rules, the clerk is responsible for keeping the civil docket, entering, among other things, "all appearances, orders, verdicts, and judgments[.]" Fed. R.Civ.P. 79(a). Here, the clerk's entry in the civil docket reads: "ORDER by Judge Terry J. Hatter granting dfts' motion to dismiss [14–1], [7–1] terminating case (Ent 12/15/98), MD JS–6, mld cpies & nots. (lori) [Entry date 12/15/98]." The clerk's entry in the docket and the stamp on the face of the Order thus conflict with the Order's language.

impact on competition." They failed to do so, and their unfair competition claim cannot survive.

**2.** Because plaintiffs failed to allege any anticompetitive effects of defendants' conduct, I

do not address defendants' arguments on the "filed-rate doctrine" (discussed in part V.D. of the majority's opinion) and the Commerce Clause (discussed in part V.E.).

Notwithstanding the clerk's designation on the district court's order and in the civil docket that the case was closed, "a docket entry is not *per se* a judgment .... courts render judgments; clerks only enter them on the court records." *Burke v. Commissioner of Internal Revenue,* 301 F.2d 903 (1st Cir.1962). For purposes of determining whether a final judgment had been entered from which plaintiffs could appeal, the district court's action, not the clerk's, controls. *See C.I.T. Financial Service v. Yeomans,* 710 F.2d 416 (7th Cir.1983)(per curiam) ("The entry on the docket sheet is merely a ministerial act performed by the court clerk pursuant to Rule 79(a) of the Federal Rules of Civil Procedure. Such entry is not a judicial act of adjudication exhibiting the judge's statement of the substance of the court's decision, sufficient as a basis for invoking this Court's jurisdiction."). Without a transcript, the court of appeals could not assess whether the district court's statement from the bench "embodied the essential elements of judgment or was merely a forecast of the final action it intended to take." *Id.* at 903–04. Here, not only is there no transcript, but there was no hearing. Similarly, there was no minute order indicating the district court intended to enter a final judgment, nor is there a final judgment. "The lack of a final written judgment entered by the clerk of the district court is not a technicality. A final written judgment is an indication to the parties and to this court that the district court considers its task completed." *Wood v. Coast Frame Supply, Inc.,* 779 F.2d 1441, 1442–43 (9th Cir. 1986); *see also State of California v. Harvier,* 700 F.2d at 1219 ("the final order rule is more than a mere formality. The rule

embodies the substantive policy that legal issues should be developed initially before the district courts.").

The Local Rules for the Central District of California similarly provide that "[n]otation in the civil docket of entry of a memorandum of decision, an opinion of the Court, or a minute order of the Clerk shall not constitute entry of judgment pursuant to F.R. Civ. P. 58 and 79(a) unless specifically ordered by the judge." Local Rules for the Central District of California, Rule 14.10.5. "The clerk's act of entering a minute order—even a minute order that would satisfy the separate judgment requirement—can not effect an entry of judgment unless the district court judge specifically orders it to be so." *Radio Television Espanola S.A. v. New World Entertainment, Ltd.,* 183 F.3d 922, 930 (9th Cir.1999). The court added: "In the Central District of California, to give the prevailing party [awareness of its rights], simple procedures such as rendering a judgment in a separate document and entering that judgment as a judgment on the civil docket are all that have to be followed. The rules require no more than that, but cannot be satisfied with less." *Id.* at 932.

On this record, it is nearly impossible to ascertain the district court's, rather than the clerk's, intent. There was no hearing, minute order, or statement in the Order. In addition, defendants Kraft, Borden, and Alpine Lace sought dismissal of plaintiffs' *complaint* (not the action) for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In the opposition to defendants' motion, plaintiffs requested leave to amend if the court *granted* defendants' motion.[3] The record

---

**3.** Contrary to the majority's statement that the plaintiffs sought leave to amend unless the court determined no possible amendment would cure the complaint's deficiencies[,] plaintiffs actually requested leave to amend "to determine if they can allege facts sufficient to meet the applicable legal standard set forth by this Court." This may seem a minor distinction, but to the extent the majority seeks to divine from the district court's silence just what the court intended in granting

defendants' motion to dismiss, it is necessary to state accurately what plaintiffs sought if, as happened, the district court granted defendants' motion. The majority errs here. The plaintiffs wanted a chance to amend if the district court granted the motion. By granting the motion, the district court implicitly acknowledged plaintiffs' request, particularly given the absence of a statement that a sepa-

thus supports the conclusion that the district court did not intend to terminate the action.

Our analysis would not be complete without recognizing the strong policy favoring leave to amend. In dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000)(en banc)(internal citations omitted). "It is of no consequence that no request to amend the pleading was made in the district court." *Schreiber Distributing v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Here, plaintiffs *did* seek leave to amend, and the district court nowhere indicated that it had determined plaintiffs could not cure the defects in their complaint. It simply is not reasonable to assume that the district court intended to dismiss the entire action in these circumstances.

It is possible, of course, that the district court did intend to dismiss the entire case and enter the requisite judgment, but that intent is not discernible from this record. I am not inclined either to read the district court's subjective intent into the Order or to deem the clerk's ministerial actions a substitute for the requisite final judgment. Accordingly, I would dismiss this appeal for lack of jurisdiction.

## II

### Plaintiffs' Failure to State a Claim for Relief

Context may not be everything, but it matters. This action presents a novel overarching question: when a state has already stepped in to eliminate the uncertainties of competition by setting a price *floor*, can alleged meddling with the state's regulatory scheme which *lowers* that floor

rate judgment would be entered or otherwise ending the case.

violate the antitrust laws? As it turns out, our courts offer no obvious answer. It is clear, though, that a rote application of antitrust law—whether federal or state—is not particularly enlightening. Only a return (briefly) to antitrust principles and common sense will aid in resolving the issue. First, though, the context.

### California's Milk Pricing System

Unlike the federal milk marketing orders that affect milk prices elsewhere in the United States, California uses a complex set of stabilization, marketing, and pooling plans to determine price. As the Dairy Marketing Branch of the California Department of Food and Agriculture ("CDFA") stated, "[t]he intricacies of the system are often not fully understood which leads to confusion even among those whose livelihood relies on this system." *See* "Milk Pricing in California," DMB–SP–101 at *http://www.cdfa.ca.gov/dairy/milkpricing.pdf.* Significantly for plaintiffs' claims, the milk marketing program establishes *minimum* prices based on end product use. The CDFA Dairy Marketing Branch explains:

> These prices are established within defined marketing areas where milk production and marketing practices are similar. Currently, California operates its milk pricing plan with two marketing areas: Northern California and Southern California. Each marketing area has a separate but essentially identical Stabilization and Marketing Plan. Each plan provides formulas for pricing the five classes of milk.

*Id.*

California's milk pricing program dates back to 1935. The Legislature enacted the Milk Stabilization Act, authorizing the Director of Agriculture to set minimum prices for milk at the producer, wholesale, and retail levels. *See Jersey Maid Milk Products Co. v. Brock*, 13 Cal.2d 620, 626–32, 91 P.2d 577 (1939).[4] The constitution-

4. "The general authority of the Director of Agriculture to fix minimum prices under the Milk Control Act . . . has been considered and upheld." *Challenge Cream & Butter Ass'n v.*

ality of the scheme was upheld many years ago. *Golden Cheese Company of California v. Voss,* 230 Cal.App.3d 727, 731, 281 Cal.Rptr. 602 (1991) (citations omitted). The Legislature expressly intended the Act "to stabilize milk production and provide an adequate milk supply at reasonable prices to consumers." *L.T. Wallace v. Consumers Cooperative of Berkeley, Inc.,* 170 Cal.App.3d 836, 840, 216 Cal.Rptr. 649 (1985), *citing In re Willing,* 12 Cal.2d 591, 594, 86 P.2d 663 (1939).[5]

Although the CDFA sets and enforces minimum prices, it has no authority to prohibit purchases and sales above that level. Opinion No. 90–936, 74 Op. Att'y Gen. 63, 64 (1991). Indeed, the California Attorney General quoted an earlier formal opinion regarding the milk marketing program with approval as follows: "The act does not in our opinion intend to protect distributors against the hazards of legitimate competition." *Id.* at 67, *quoting* Ops. Cal. Atty. Gen. No. N.S. 2131 (1939). The Attorney General added that the relevant statutory provisions "in no way purport to deal with negotiated prices above the minimum prices established." In sum, California establishes the price floor, artificially propping up milk prices. Plaintiffs may not sell (and defendants may not purchase) milk at a price below the floor, but nothing precludes transactions at any price above the support level. Given this context, plaintiffs cannot state a claim for violation of California's antitrust laws based on the conduct alleged in their complaint.

### *California's Antitrust Law*

"The [Cartwright] Act generally condemns as unlawful 'every trust.' Cal. Bus. & Prof.Code § 16721. It defines 'trust' as a 'combination of capital, skill or acts' to restrain trade, to limit or prevent competition or to fix or control prices. Cal. Bus. & Prof.Code § 16720." State Bar of Cali-

fornia (Antitrust and Trade Regulation Law Section), *California Antitrust Law* 6–7 (1991 and Supp.1994) (*"CA Antitrust Law"*). "California antitrust law generally contains provisions similar to the federal antitrust law, and both find their roots in common law precedent barring restraints of trade." *See, e.g., Exxon Corp. v. Superior Court (Koutney),* 51 Cal.App.4th 1672, 1680, 60 Cal.Rptr.2d 195 (1997) (Both the Cartwright Act, Bus. & Prof.Code §§ 16700 et seq., and the Sherman Antitrust Act, 15 U.S.C. §§ 1 et seq., "[were] enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.").

Although the Cartwright Act's structure and language differ considerably from the Sherman Act, California courts have repeatedly found that the Cartwright Act was "'patterned after the Sherman Act.'" *CA Antitrust Law* at 22, citing *Blank v. Kirwan,* 39 Cal.3d 311, 320, 216 Cal.Rptr. 718, 703 P.2d 58 (1985); *Corwin v. Los Angeles Newspaper Service Bureau, Inc.,* 4 Cal.3d 842, 853, 94 Cal.Rptr. 785, 484 P.2d 953 (1971) ("decisions under the latter act are applicable to the former."). "While this 'history' of the Cartwright Act had no basis in fact, it had the obvious attraction of immediately creating a huge body of readily accessible law available to interpret the Cartwright Act." *CA Antitrust Law* at 22.

California courts have now recognized that the Sherman and Cartwright Acts do differ in legislative intent and history, as well as in statutory construction and language. *See CA Antitrust Law* at 12. In *State ex rel. Van de Kamp v. Texaco, Inc.,* 46 Cal.3d 1147, 252 Cal.Rptr. 221, 762 P.2d 385 (1988), the California Supreme Court re-examined the history of the Cartwright Act. After determining that the Cartwright

---

*Parker,* 23 Cal.2d 137, 140, 142 P.2d 737 (1943), *citing Jersey Maid* and *Ray v. Parker,* 15 Cal.2d 275, 101 P.2d 665 (1940).

**5.** "On December 30, 1976, the Director issued orders suspending minimum retail milk price

regulations throughout the state." *Id.* at 842, 216 Cal.Rptr. 649. By Statutes of 1977, chapter 1192, the Legislature removed both retail and wholesale milk product prices from the pricing system. 74 Ops. Atty. Gen. 63, 64 (1991).

Act was not based on the Sherman Act, the court explained that " 'judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent.' " *CA Antitrust Law* at 22, quoting *Texaco*, 46 Cal.3d at 1164, 252 Cal.Rptr. 221, 762 P.2d 385. Rather, "the appropriate use of federal cases interpreting the Sherman Act is as an aid in interpreting our own Cartwright Act, not as controlling precedent...." *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224, 1240–41, 18 Cal.Rptr.2d 308 (1993) (finding "filed-rate doctrine" inapplicable to cause of action for price fixing under the Cartwright Act). Just the same, the two acts share the purpose of promoting competition and increasing consumer welfare; the enormous body of Sherman Act case law thus assures the continuing influence of Sherman Act precedents on Cartwright Act claims. *See CA Antitrust Law* at 31–32.

Plaintiffs have alleged that defendants combined or colluded to suppress the cost of milk defendants purchased from plaintiffs. Plaintiffs assert that defendants did so by selling *cheese* on a commodity exchange (the short-lived National Cheese Exchange or "NCE") at prices below those they could have sold their cheese for off the NCE. Plaintiffs allege that by combining to lower the cheese price on the NCE, defendants manipulated the California milk pricing formula, and, consequently, the price of milk. This conduct, plaintiffs maintain, constitutes "price-fixing," and so, they also maintain, warrants application of a rule of *per se* liability for price-fixing. *See, e.g., Kolling v. Dow Jones & Co., Inc.*, 137 Cal.App.3d 709, 721, 187 Cal.Rptr. 797 (1982) ("any combination which tampers with price structures constitutes an unlawful activity.").[6]

There is a well established tradition of applying a rule of *per se* liability to "price-fixing." The rationale for this long-standing condemnation of business behavior that fits within the rubric of "price-fixing" was

set forth over seventy years ago, when the Supreme Court explained that the "aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices." *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

To every rule, though, there are exceptions and limits. And in this area, the Supreme Court has inveighed against unthinking application of the rule of *per se* liability when the basic justification for the rule is not present. It is not *always* the case that a practice that fits the term "price-fixing" in fact raises the concerns identified in *Trenton Potteries*. *See BMI v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("Literalness is overly simplistic and often overbroad."). Rather, following the Supreme Court's lead, we should at least take a cursory look to determine whether the conduct at issue has such a "predictable and pernicious anticompetitive effect" that a court can "predict with confidence that the rule of reason will condemn it." *State Oil Co. v. Khan, Khan & Associates*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

Following such a functional approach, the Court in *Khan* held that vertical maximum price fixing is not *per se* illegal price-fixing; the Court in *BMI* similarly held that price-fixing of the product of a joint venture was not *per se* illegal price fixing. The common thread in both cases was that an analysis of the economic effects of the practices did not make it clear that the rule of reason would condemn the practice.

While one can find allegations of literal "fixing" of "prices" in this case, the alleged behavior is functionally different from the price-fixing that courts have condemned as illegal *per se*. Plaintiffs fail to allege de-

---

**6.** Plaintiffs requested an opportunity to replead under the "rule of reason," although they offered no specifics as to their ability to do so.

fendants tampered with prices *in a way that necessarily would have an anticompetitive effect.* In fact, based on the scheme alleged, anticompetitive effect cannot be established at all. Reducing plaintiffs' allegations to their essence, defendants are accused of manipulating cheese prices, thereby causing the CDFA to use false (that is, unrepresentatively low) data on cheese prices, which in turn caused the CDFA to *permit* sales of milk at a lower floor price.

The majority, citing a well-respected treatise by Professors Areeda and Hovenkamp, plausibly assert that if defendants successfully colluded to buy at a lower price, potential anticompetitive harm would occur if the buyers were able to drive the buying price below the price that would exist in competitive equilibrium. If buyers successfully *fix* sub-competitive prices in this way, transactions that would have occurred if buyers and sellers were subject to competitive conditions do not occur. Sellers lose sales opportunities (the upstream decrease in output Areeda and Hovenkamp identify) and, potentially, buyers sell fewer goods (the downstream decrease in output that Areeda and Hovenkamp describe).

But that is not what we have here. Assuming that defendants succeeded in manipulating the NCE so as to cause the CDFA to set a lower price support, we must remember that all this means is that there is now a lower *floor*—a lower price below which sellers are restrained from making deals. The effect—contrary to the paradigm case in which market participants meddle with prices—is simply to *allow* deals to be made over a broader range of potential prices. The existence of a new, lower price floor does not *mandate* that any sellers or buyers make deals at or near the new floor. Absent some other alleged restraint on the market, the *actual price* will be determined by sellers and buyers acting independently of their re-

spective competitors. With the lower price floor, the end result is a broader scope for independent deal-making and the free play of market forces.

This negative assessment of the alleged anti-competitive consequences further leads to the conclusion that plaintiffs face another obstacle, one that is fatal to their claim. Notably, plaintiffs erroneously assert that they need not plead an antitrust injury when they allege a *per se* violation. The Supreme Court resolved this issue a decade ago in *Atlantic Richfield Company v. USA Petroleum Company,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("*ARCO*"). The Court considered whether a firm's sales losses caused by a competitor charging nonpredatory prices under a vertical, maximum-price-fixing scheme constituted an antitrust injury. As long as the prices were not predatory, the Court found, plaintiff's harm was not an "antitrust injury." To satisfy the antitrust injury requirement, a plaintiff must be "adversely affected by an anticompetitive aspect of the defendant's conduct." *Id.* at 339, 110 S.Ct. 1884, *citing Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 487, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Significantly for the instant case, the Supreme Court held "[t]he allegation of a *per se* violation does not obviate the need to satisfy this test." *ARCO,* 495 U.S. at 346, 110 S.Ct. 1884. Indeed, "[t]he need for this showing is at least as great under the *per se* rule as under the rule of reason." *Id.* at 344, 110 S.Ct. 1884.[7] The Court rejected the argument that "any loss flowing from a *per se* violation of [Sherman Act] § 1 automatically satisfies the antitrust injury requirement." *Id.* at 335, 346, 110 S.Ct. 1884.

The antitrust injury requirement serves an important function. As the Supreme Court explained, the requirement "ensures that the harm claimed by the plaintiff cor-

---

7. The Court noted that it had previously held that plaintiffs still had to show antitrust injury in a case involving horizontal price fixing. 495 U.S. at 344, 110 S.Ct. 1884, *quoting Mat-* *sushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584 n. 7, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

responds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." *Id.* at 342, 110 S.Ct. 1884. Although certain conduct might violate antitrust laws, it may not have anticompetitive effects:

> [P]rocompetitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages.

*Id.* at 344, 110 S.Ct. 1884, *quoting* Page, "The Scope of Liability for Antitrust Violations," 37 *Stan. L. Rev.* 1445, 1460 (1985); *see also American Ad Management, Inc. v. General Telephone Company of California,* 190 F.3d 1051, 1055 (9th Cir.1999) ("The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct. It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers."). The antitrust injury requirement thus "precludes any recovery for losses resulting from competition, even though such competition was actually caused by conduct violating the antitrust laws." II Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW § 362a (rev. ed.1995).

Nothing in recent California antitrust jurisprudence eliminates the antitrust injury requirement. In *Cellular Plus,* the court observed that the *scope* of the requirement was broader than under the Sherman Act, but relied on the definition in *Kolling,* which in turn cited the Supreme Court's decision in *Brunswick.* 14 Cal.App.4th at 1234, 18 Cal.Rptr.2d 308. In *Cellular Plus,* moreover, the "broader" parameters of antitrust injury under the Cartwright Act simply permitted "indirect" purchasers to seek relief. The court never repudiated the law developed under the Sherman Act.

Indeed, in cases since *Cellular Plus,* courts have affirmed California's continued reliance on federal law for interpretive guidance. *See, e.g., Freeman v. San Diego Ass'n of Realtors,* 77 Cal.App.4th 171, 183 n. 9, 91 Cal.Rptr.2d 534 (2000) ("we frequently examine federal precedent because the Cartwright Act is similar in language and purpose to the Sherman Act ... although ... not co-extensive."); *Morrison v. Viacom, Inc.,* 66 Cal.App.4th 534, 541 n. 2, 78 Cal.Rptr.2d 133 (1998) ("Though not always directly probative of the Cartwright drafters' intent, judicial interpretations of the Sherman Act are, nevertheless, often helpful because of the similarity in language and purpose between the federal and state statutes."); *Vinci v. Waste Management, Inc.,* 36 Cal.App.4th 1811, 1814, 43 Cal.Rptr.2d 337 (1995) ("because the Cartwright Act has objectives identical to the federal antitrust acts, the California courts look to cases construing the federal antitrust laws for guidance in interpreting the California act."); *Roth v. Rhodes,* 25 Cal.App.4th 530, 542, 30 Cal.Rptr.2d 706 (1994) ("federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."). Plaintiffs cannot satisfy the requirement to plead an antitrust injury merely by alleging a *per se* antitrust violation.

Following *Brunswick,* plaintiffs have been required to prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." 429 U.S. at 489, 97 S.Ct. 690. As this Circuit stated in *American Ad Management,* "[p]laintiffs sometimes forget that the antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct." 190 F.3d at 1055. One of the functions that the inquiry into antitrust injury serves is to "enable[ ] antitrust courts to dispose of more claims at an early stage of the litigation by simply examining the logic of plaintiff's theory of injury...." II Areeda and Hovenkamp, *Antitrust Law* at ¶ 362a.

It is axiomatic that antitrust claims must "make economic sense." *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,* 141 F.3d 947, 952 (9th Cir.1998). The very purpose of the Sherman Act is protection of "the economic freedom of participants in the relevant market." *American Ad Management,* 190 F.3d at 1057, *quoting Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Consistent with this principle, a plaintiff must "suffer[ ] its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Id.* at 1057.

By alleging that the milk price supports would have been higher in the absence of the defendants' manipulation of the NCE, plaintiffs acknowledge that California's milk prices are not set in a competitive market. Over four decades ago, the United States Department of Agriculture explained the reasoning behind milk support prices, applicable to this day:

> to control price cutting and "destructive" competition, to protect against producer price cuts and losses caused by dealers' bankruptcies; to protect a state's producers and distributors against competition from low-priced out-of-state milk, to maintain distributor margins that will enable the industry to pay reasonable prices to producers; to prevent price manipulation by distributors for the purpose of strengthening their competitive position, to check rebates and other advantages given customers with exceptional bargaining powers and to make determination of resale prices public rather than a matter for secret understanding.

*See* L.J. (Bees) Butler, "Making Sense of California Milk Standards and Prices," 3 *Agricultural and Resource Economics Update* 3, 5 (Winter 2000), *quoting* USDA–AMS, Report No. 98 (1955). The public policy behind price supports is distinctly *non* competitive in nature. *See also Knudsen Creamery,* 37 Cal.2d at 491, 234 P.2d 26 (one of the purposes of the Milk Control Act is "to authorize and enable the director to prescribe marketing areas and to *determine prices* to producers for fluid milk or fluid cream, or both[,]" and to "eliminate economic disturbances and unfair trade practices in the milk industry[.]") (emphasis added). It is not enough to allege a disruption or distortion in competition: "Every antitrust violation can be assumed to 'disrupt' or 'distort' competition." *ARCO,* 495 U.S. at 340 n. 8, 110 S.Ct. 1884. Injury in fact is not the same as antitrust injury, nor can the requirement be satisfied by "broad allegations of harm to the 'market' as an abstract entity." *Id.*

Although not so alleged in their complaint, plaintiffs characterize their claims as involving either a "buyers' cartel"[8] or "monopsony." They have not, however, alleged that defendants could require plaintiffs to *accept* a specific price, which, of course, is the essence of a cartel. There are no allegations that defendants dominated the milk market in a manner that enabled them to restrict the milk producers' ability to sell their milk to alternative buyers. *See Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 222–25, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (describing sugar refiners' total domination of the local sugar beet market). Plaintiffs' counsel conceded during oral argument that the milk producers were free to sell milk at prices above the minimum support price but for the fact that the demand for milk did not support a higher price. The complaint contains no allegation that defendants could or did restrain this demand. Indeed, given that milk is used for a variety of other purposes be-

---

**8.** This type of cartel exists when members of the cartel force suppliers to charge them prices below the competitive level. *See Vogel v. American Society of Appraisers,* 744 F.2d 598, 601 (7th Cir.1984).

sides the manufacture of cheese, it is doubtful that defendants could ever exercise monopsony power over the milk supply. *See U.S. Healthcare,* 986 F.2d at 598 (rejecting monopsony claim against an HMO that purchased doctors' services because "doctors have too many alternative buyers for their services"). Nothing prevents plaintiffs from selling their milk at any price above the floor to a willing buyer, whether that buyer is a cheese manufacturer, fluid milk bottler, butter plant, ice cream company, or other dairy product manufacturer.

The anti-competitive harm plaintiffs have alleged, namely, lowering of the milk price floor, will have one of two effects, neither of which is "anti-competitive." If defendants managed to force the price floor down lower than it otherwise would be but that level was still *above* the price that would exist in a competitive market without any price supports, the lower price floor will simply allow mutually-beneficial transactions that would not have occurred under the higher price floor. The lower price floor actually opens the market up more to the forces of competition.[9]

The second possibility is that the price floor resulting from defendants' conduct will be *below* competitive equilibrium. There still will be no harm to competition precisely because only a price floor is at issue. Milk producers still are permitted to sell at prices *above* the floor. And without an actual buyer cartel, the price that results should be the price set at competitive equilibrium. After all, milk producers will not sell below cost just because the law permits them to do so.

In sum, plaintiffs have not alleged price-fixing conduct by defendants that should properly be analyzed as *per se* violations. Moreover, even granting that defendants succeeded in manipulating the price of cheese on the NCE and the milk pricing formula in California, plaintiffs have of-

fered no viable theory or relevant authority to explain how lowering the price floor would restrain competitive forces. Accordingly, I would affirm the district court's order.

---

9. The supra-competitive price maintained by the price supports would restrain milk producers from selling milk to willing buyers at prices that still would be above marginal cost.

The lowering of that supra-competitive price would permit those transactions, which otherwise would not occur.