**KINGRAY, INC. d/b/a the Beer Hunter, a California corporation, et al., Plaintiffs,**

**v.**

**NATIONAL BASKETBALL ASSOCIATION, INC. et al., Defendants.**

**No. CIV. 00CV1545–L.**

United States District Court, S.D. California.

Feb. 1, 2002.

Daral B. Mazzarella, John F. McGuire, Jr., Karen R. Frostrom, Thorsnes Bartolotta and McGuire, San Diego, CA, Jefferson H. Read, Oldenettel and Associates, Mark A. Hovenkamp, Grayson and Hovenkamp, Houston, TX, Jonathan S. Massey, Law Offices of Jonathan S. Massey, Washington, DC, Jeffrey R. Vaughan, Law Offices of Jeffrey R. Vaughn, Houston, TX, Stephen F. Ross, Champaign, IL, for Plaintiffs.

Douglas B. Adler, Daniel E. Sobelsohn, Skadden Arps Slate Meagher and Flom, Los Angeles, CA, Jeffrey A. Mishkin, Charles Scott Lent, Skadden Arps Slate Meagher and Flom, New York City, Richard W. Buchanan, National Basketball Association, New York City, Robert Andrew Sacks, Sullivan and Cromwell, Los Angeles, CA, Richard E. Constable, III, Sullivan and Cromwell, New York City, Gerald L. McMahon, Seltzer Caplan McMahon Vitek, San Diego, CA, Dale H. Oliver, Quinn Emanuel Urquhart Oliver and Hedges, Los Angeles, CA, for Defendants.

## ORDER RE: (1) DIRECTV, INC.'S MOTION TO DISMISS; AND (2) NBA DEFENDANTS' MOTION TO DISMISS

LORENZ, District Judge.

This matter comes before the Court on Defendants' motions to dismiss the First Amended Complaint. The Court finds these motions suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1).

### FACTUAL BACKGROUND

Plaintiffs, individuals and commercial establishments, have filed this lawsuit on behalf of commercial and residential purchasers of the "NBA League Pass," the broadcast of a bundled package of NBA basketball games. (First Amended Complaint ("FAC") ¶¶ 1, 55.) Plaintiffs purchased this subscription through DirecTV, a provider of satellite television programming. (FAC ¶¶ 21, 33.) Plaintiffs allege the NBA League Pass violates federal and state antitrust laws and California's Unfair Competition Act. Defendants are the National Basketball Association, Inc. ("NBA"), NBA Properties, Inc. ("NBA Properties"), DirecTV, and several professional basketball organizations. (FAC ¶¶ 8–17.) These basketball organizations are: Chicago Professional Sports Limited Partnership d/b/a Chicago Bulls; LAC Basketball Club, Inc. d/b/a Los Angeles Clippers; Royal Kings Limited Partnership, d/b/a Sacramento Kings; the Los Angeles Lakers, Inc., d/b/a Los Angeles Lakers; Madison Square Garden, L.P. d/b/a New York Knicks; Jazz Basketball Investors, Inc., d/b/a the Utah Jazz; and Trail Blazers, Inc., d/b/a Portland Trailblazers (collectively referred to as the

"NBA Teams"). (FAC ¶¶ 10–16.) NBA, NBA Properties, and NBA Teams are hereinafter collectively referred to as "NBA Defendants."

Prior to the enactment of the Sports Broadcasting Act ("SBA"), collective agreements between professional sports leagues and broadcast television providers were found to be horizontal agreements in violation of the Sherman Antitrust Act ("Sherman Act"). (FAC ¶ 42.) Following the Eastern District of Pennsylvania's decision in *United States v. National Football League*, 196 F.Supp. 445 (E.D.Pa. 1961), professional sports leagues successfully lobbied for the SBA, which carves out an exemption for a clearly delineated class of such agreements. *Id.* Under the SBA, the antitrust laws "shall not apply to any joint agreement [concerning] organized professional team sports of football, baseball, basketball, or hockey ... in the sponsored telecasting of the games of football, baseball, basketball, or hockey." (FAC ¶ 43 (*quoting* 15 U.S.C. § 1291) (emphasis in original).) "Sponsored telecasting" under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks. *Id.*

The NBA is currently comprised of 29 independently owned and operated professional basketball teams that have joined the NBA to compete in its professional basketball league. (FAC ¶ 48.) Each of the 29 NBA Teams is franchised by the NBA and is an independent business entity.[1] (FAC ¶¶ 49–50.) Each NBA team competes with one another for, *inter alia*, the acquisition of players, coaches, and management personnel. (FAC ¶ 50.) Each NBA team derives separate revenues from local television and radio, parking, concessions, and box seating. *Id.* The NBA Teams do not share their expenses, profits, or losses. *Id.*

The NBA Teams have authorized the NBA, through its Board of Governors and Commissioner, and/or NBA Properties, to contract on their behalf for the live video telecasting of certain regular season and post-season games. (FAC ¶ 51.) Each NBA team has agreed with the other NBA teams and/or with the NBA not to compete in the sale of rights for the live video telecasting of regular season games. (FAC ¶ 52.) The NBA Teams have, pursuant to the SBA, jointly agreed to sell the rights to selected regular season games to the NBA to sell to television networks for over-the-air sponsored (free) broadcasting. (FAC ¶ 53.) The NBA Teams have also jointly agreed to sell rights to other selected regular season games to the TNT or TBS stations for non-sponsored (pay) national cable broadcasting. *Id.* By agreement, each of these regular season games can be broadcast only within each team's protected geographical territory ("in-market games"). (FAC ¶ 54.) With few specified exceptions, the agreement(s) among the NBA and the NBA Teams forbid the broadcast of any NBA game in any geographic market except those licensed by the NBA Team in that geographic market ("out-of-market games"). *Id.*

Beginning in the 1994–95 NBA season, the NBA Defendants agreed to sell jointly their broadcast rights at what Plaintiffs contend is artificially inflated prices.

---

1. In addition to the NBA team Defendants, the NBA franchise teams operate under the following names: Boston Celtics, Miami Heat, New Jersey Nets, Orlando Magic, Philadelphia 76ers, Washington Wizards, Atlanta Hawks, Charlotte Hornets, Cleveland Cavaliers, Detroit Pistons, Indiana Pacers, Milwaukee Bucks, Toronto Raptors, Dallas Mavericks, Denver Nuggets, Houston Rockets, Minnesota Timberwolves, San Antonio Spurs, Vancouver Grizzlies, Golden State Warriors, Phoenix Suns, and Seattle SuperSonics. (FAC ¶ 49.)

(FAC ¶ 53.) Plaintiffs allege the NBA Defendants conspired with DirecTV for the broadcast of a bundled package of NBA out-of-market basketball games, agreeing to restrict output of those games according to geographical market, price, and quantity. (FAC ¶ 55.) Pursuant to this combination, conspiracy, and/or contract, the Defendants made available for purchase at a fixed price, a package to residential and commercial satellite dish owners, using a DirecTV-compatible C-band or Kuband DSS satellite dish antenna broadcasts, of up to 40 out-of-market regular season NBA games per week and more than 1000 regular season games per year. (FAC ¶ 56.) This package is called the "NBA League Pass." *Id.* Such satellite users may not opt to purchase these out-of-market games individually, but are required to buy the entire package. *Id.*

The Defendants have agreed that the NBA League Pass is the exclusive means by which out-of-market games may be licensed for satellite viewing by individual consumers and/or commercial establishments. (FAC ¶ 57.) The Defendants have further agreed that these games will not be distributed via sponsored telecasts. *Id.*

Defendants have agreed to "black out" the re-broadcast of certain NBA games to maintain "protected territories" of certain NBA Teams. (FAC ¶ 58.) Specifically as to the NBA League Pass, the Defendants have also agreed to black out games publicly advertised as included in the NBA League Pass even when those games are outside of the "protected territories." *Id.* Plaintiffs allege these black-outs have re-

sulted in reducing the output of NBA professional basketball games. *Id.*

As of 1998, satellite users must purchase the NBA League Pass through DirecTV. (FAC ¶ 61.) No other satellite provider is authorized to provide the NBA League Pass games. *Id.* On April 22, 1998, DirecTV and the NBA executed a renewal contract for the distribution of the NBA League Pass. (FAC ¶ 62.) That contract stated that DirecTV's rights were "non-exclusive." *Id.* It further provided that only two distribution licenses would be issued, one to DirecTV and one to PrimeStar, and that if DirecTV "became aware" of the termination of PrimeStar's license, it would have the right to become the exclusive distributor of the NBA League Pass. *Id.* Less than one week later, DirecTV acquired PrimeStar and exercised its contractual option to become the exclusive distributor of the NBA League Pass. *Id.* On August 4, 1999, DirecTV and the NBA executed an amended distribution contract confirming that DirecTV was the exclusive distributor of the NBA League Pass. (FAC ¶ 63.) According to Plaintiffs, one DirecTV competitor, Echostar, offers high power direct broadcast satellite service but is barred from distributing the NBA League Pass. (FAC ¶ 64.)

Beginning in 2000, the NBA contracted with iN Demand to provide the NBA League Pass to residential cable subscribers on a pay-per-view basis.[2] (FAC ¶ 66.) "Pay-per-view" programming allows cable subscribers to watch certain events on television for a cost additional to their existing cable rates. *Id.* iN

---

**2.** The Court notes that the FAC alleges "Defendant iN Demand" in its factual background section, (*see* FAC ¶ 66), but does not list iN Demand as a Defendant in the section listing the Defendants to this action. (*See* FAC ¶¶ 8–20.) Insofar as the FAC purports to add iN Demand as a Defendant, its efforts are not well taken. By order dated June 18,

2001, this Court allowed Plaintiffs leave to amend their complaint, but specifically stated that they could not add iN Demand as a Defendant because they had unequivocally asserted in their briefs that they were *not* seeking to add new defendants, but only new plaintiffs. (June 18, 2001, Order at 26 n. 5, 30–31.)

Demand provides "pay-per-view" programming to cable companies and their subscribers nationwide. *Id.* Cable subscribers must order the NBA League Pass through iN Demand although their payments may be processed through the local cable providers and their service is routed through their local cable companies. *Id.*

Plaintiffs allege the agreement to restrain the sale of rights to any NBA game outside of the team's assigned geographic territory except through the "NBA League Pass" is not reasonably necessary to achieve any legitimate business objective. (FAC ¶ 59.) According to Plaintiffs, the system of exclusive geographic territories is not necessary to preserve the viability of any individual NBA Team in attracting fans to live games, but only serves to artificially increase prices and reduce output. *Id.* Plaintiffs further contend that the system of exclusive territories is not necessary to preserve the quality and attractiveness of NBA games by promoting competitive balance among NBA teams as this concern could be addressed, as it is in Major League Baseball, by a system of revenue-sharing. *Id.* According to Plaintiffs, the continuing agreement and conspiracy among the Defendants was to fix, raise, stabilize, and maintain prices for the rights to, and to restrict the output of, video broadcasts of out-of-market NBA games. (FAC ¶ 60.)

### PROCEDURAL BACKGROUND

Plaintiffs Garrett Crayton ("Crayton") and Jill Miller ("Miller") have filed this action on their individual behalf and on behalf of all persons who purchased the residential service package of the NBA League Pass from DirecTV in a jurisdiction subject to the laws of the United States. (FAC ¶¶ 6, 21.) Crayton and Miller also bring this action on their individual

behalf and on behalf of all persons who purchased the residential service package of the NBA League Pass from DirecTV in a jurisdiction subject to the laws of California. (FAC ¶ 22.) Plaintiff Gregory Cuff ("Cuff") brings this action on his individual behalf and on behalf of all persons and entities who have purchased the residential service package of the NBA League Pass from a cable television service provider in a jurisdiction subject to the laws of the United States. (FAC ¶¶ 7, 27.) Cuff also brings this action on his individual behalf and on behalf of all other persons and entities who have purchased the residential service package of the NBA League Pass from a cable television service provider in a jurisdiction subject to the laws of the States of California. (FAC ¶ 28.) Plaintiffs Danray, Inc. d/b/a The Beer Hunter, Rayban, Inc., d/b/a The Beer Hunter, and Bobray Restaurants, Inc. d/b/a The Beer Hunter (collectively referred to as "The Beer Hunters") bring this action on their individual behalf and on behalf of all persons and entities who have purchased the commercial package of the NBA League Pass from DirecTV in a jurisdiction subject to the laws of the United States. (FAC ¶¶ 3–5, 32.) The Beer Hunters also bring this action on their individual behalf and on behalf of all persons and entities who purchased the commercial package of the NBA League Pass from DirecTV in a jurisdiction subject to the laws of California. (FAC ¶ 33.)

Plaintiffs allege that beginning in 1994 and to the present, Defendants have engaged in a continuing contract, combination, and conspiracy that unreasonably restrains trade and commerce in violation of Section 1[3] of the Sherman Act. Plaintiffs also allege that Defendants have violated California's Cartwright Act and California's Unfair Competition Act.

---

**3.** Unless otherwise noted, all future citations to "Section" reference the Sherman Act.

DirecTV challenged the initial complaint with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) [4] or in the alternative, motion to compel arbitration. While these motions were under submission with the Court, Plaintiffs filed a motion to amend the Complaint. By order dated June 18, 2001, this Court granted in part and denied in part DirecTV's motion to dismiss, denied DirecTV's motion to compel arbitration, and granted Plaintiffs leave to amend the complaint. Plaintiffs subsequently filed the FAC that is the subject of the instant motions to dismiss.

## DISCUSSION

### I. *Applicable Law.*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal of a claim under this Rule is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Navarro,* 250 F.3d at 732. Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir.1984); *see Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson,* 749 F.2d at 534.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the Court takes judicial notice. *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998); *Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.1994); *MGIC Indem. Co. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986). In addition, the court may consider "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint." *Parrino,* 146 F.3d at 706.

### II. *The Sherman Act Section 1 Claims.*

 In analyzing the sufficiency of the FAC's antitrust allegations, the Court is mindful that generally, "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators." *Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554, 560 (8th Cir.1998). Nevertheless, the essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to defeat a motion to dismiss. *Id.* at 558. If the alleged facts "do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." *Rutman Wine Co. v. E. & J. Gallo*

---

4. All future citations to "Rule" reference the Federal Rules of Civil Procedure.

*Winery,* 829 F.2d 729, 736 (9th Cir.1987) (internal quotations omitted). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1024 (10th Cir.1992). Further, "whether specific conduct is anticompetitive is a question of law." *Smilecare Dental Group v. Delta Dental Plan of California,* 858 F.Supp. 1035, 1037 (C.D.Cal.1994) (*citing Oahu Gas Serv., Inc. v. Pacific Res., Inc.,* 838 F.2d 360, 368 (9th Cir.1988)), *aff'd,* 88 F.3d 780 (9th Cir.1996). Unless plaintiffs can allege facts which, if true, would constitute an antitrust offense, dismissal is appropriate. *Rutman,* 829 F.2d at 735, 738; *Smilecare,* 858 F.Supp. at 1037.

▮ Section 1 "prohibits conspiracies and agreements that unreasonably restrain trade." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1373 (9th Cir.1989); 15 U.S.C. § 1. "A section 1 plaintiff must prove an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal under section 1." *Levine v. Central Florida Med. Affiliates, Inc.,* 72 F.3d 1538, 1545 (11th Cir.1996). But not every agreement that restrains competition violates the Sherman Act; rather, to be unlawful, the agreement must *unreasonably* restrain competition. *McDaniel v. Appraisal Inst.,* 117 F.3d 421, 422 (9th Cir.1997); *Thurman Indus.,* 875 F.2d at 1373; *Levine,* 72 F.3d at 1545. The unreasonableness of the agreement is analyzed under either a *per se* rule of illegality or a rule of reason analysis. *McDaniel,* 117 F.3d at 422; *Thurman Indus.,* 875 F.2d at 1373. The *per se* rule applies only where the practice at issue " 'facially appears to be one that would always or almost always tend to restrict competition and decrease output.' " *Rickards (D.A.), v. Canine Eye Registration Fndn.,* 783 F.2d 1329, 1332

(9th Cir.1986) (*quoting National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma,* 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)); *Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1091 (9th Cir.2000). "*Per se* violations are 'naked restraints of trade with no purpose except stifling of competition,' and have been characterized as so 'plainly anti-competitive' and lacking 'any redeeming virtue' that they are presumed illegal under § 1." *United States v. Andreas,* 216 F.3d 645, 666 (7th Cir.) (internal citation omitted), *cert. denied,* 531 U.S. 1014, 121 S.Ct. 573, 148 L.Ed.2d 491 (2000); *see National Collegiate,* 468 U.S. at 100, 104 S.Ct. 2948 (holding that a practice that facially appears to restrict competition "is presumed unreasonable without inquiry into the particular market context in which it is found."). Some practices, such as horizontal price-fixing, are subject to a *per se* analysis. *National Collegiate,* 468 U.S. at 101, n. 21.

▮ Agreements that are not presumed unreasonable under the *per se* category are analyzed under the "rule of reason" test. *Levine,* 72 F.3d at 1546. Under a rule of reason analysis, the plaintiff must show: " '(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually restrains competition.' " *Thurman Indus.,* 875 F.2d at 1373 (*quoting Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 (9th Cir.1988)); *Austin v. McNamara,* 979 F.2d 728, 738 (9th Cir. 1992). "An essential element of a Section 1 violation under the rule of reason is injury to competition in the relevant market." *Alliance Shippers, Inc. v. Southern Pac. Transp. Co.,* 858 F.2d 567, 570 (9th Cir.1988). Thus, the antitrust violation must harm competition, not just competi-

tors. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811–12 (9th Cir.1988).

In the FAC, Plaintiffs' Section 1 claims rest on four theories: first, that the NBA Defendants and DirecTV engaged in vertical price-fixing; second, that DirecTV and the NBA Defendants engaged in a vertical conspiracy to limit output; third, that the exclusive distribution agreement between the NBA Defendants and DirecTV unreasonably restrains trade; and finally, that the NBA Defendants engaged in a horizontal conspiracy to divide the market and fix prices. The Court will address each of these theories in turn.

## A. Price Fixing Theory.

Vertical price fixing occurs when a supplier attempts to fix the prices charged by those who resell its products. *General Cinema Corp. v. Buena Vista Distrib. Co.*, 681 F.2d 594, 597 (9th Cir.1982); *see Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."). A vertical price fixing scheme setting minimum prices is generally subject to *per se* analysis. *Business Elecs. Corp.*, 485 U.S. at 725–27, 108 S.Ct. 1515; *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir.1997); 1 Julian O. von Kalinowski *et al., Antitrust Laws and Trade Regulation* § 18.02[2] at 18–5 (2d ed.2000).[5] Vertical price fixing is not present when the supplier only dictates the wholesale price. *Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 344 (9th Cir.1983). Further,

"it is a longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business." *49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1468 (9th Cir.1986).

In dismissing Plaintiffs' vertical price fixing claim as alleged in the original complaint, this Court found that the pleading was ambiguous as to DirecTV's role in the alleged price fixing scheme. (June 18, 2001, Order at 12.) In particular, some of the allegations of the Complaint contended that DirecTV was involved in a conspiracy to fix prices whereas other allegations indicated the NBA Defendants acted alone. (*See* June 18, 2001, Order at 12–13.) Plaintiffs were therefore given leave to amend the complaint to add factual allegations clarifying DirecTV's role in a vertical price fixing scheme. (June 18, 2001, Order at 16.)

The FAC alleges that one of the terms of the Defendants' alleged contract, combination, and conspiracy was to "fix, raise, stabilize, and maintain prices for the rights to ... live video satellite and cable television broadcasts of NBA professional basketball games through non-exempt channels of distribution." (FAC ¶ 75; *see* FAC ¶ 60.) For purposes of formulating and effectuating this contract, combination, and conspiracy, the Defendants allegedly "[c]ontracted, conspired, and agreed to set the prices of the 'NBA League Pass' at artificially inflated and fixed levels, using a vertical price-fixing scheme setting minimum prices ('Deemed Prices') which Deemed Prices have in reality been the prices charged to consumers." (FAC

---

**5.** Vertical agreements fixing maximum resale prices, and vertical restraints not involving price fixing are generally analyzed under the rule of reason test. *Electronics Communica-* *tions*, 129 F.3d at 243; 1 Julian O. von Kalinowski *et al., Antitrust Laws and Trade Regulation* § 18.02[3] at 18–9 (2d ed.2000).

¶ 76(d).) As a result, "[c]onsumer prices have been raised, fixed, maintained, and stabilized at artificially high and non-competitive levels." (FAC ¶ 77(b).)

Defendants contend the FAC's vertical price fixing allegations fail to state a claim because they do not contain any facts but rather are as conclusory as those contained in the original complaint. Defendants further argue that the terms of the contract between the NBA Defendants and DirecTV establish DirecTV has sole discretion to set the price for the NBA League Pass, and therefore Plaintiffs' price fixing allegations fail as a matter of law.

Regarding the sufficiency of their allegations, Plaintiffs respond that they are not required to provide specific facts to support their price-fixing theory. According to Plaintiffs, given Federal notice pleading standards and limited discovery provided in this case, " 'mere conclusory' 'allegations of conspiracy in the complaint' are 'enough to survive a motion to dismiss.' " (Plts' Oppo. to DirecTV's Mtn. to Dismiss FAC at 3 (*quoting Program Eng'g, Inc. v. Triangle Pubs., Inc.*, 634 F.2d 1188, 1193 (9th Cir.1980)); Plts' Oppo to NBA Defs' Mtn. to Dismiss FAC at 4 (*quoting Program Eng'g*, 634 F.2d at 1193).) Plaintiffs further argue that the terms of the NBA–DirecTV contract do not control this action because they have alleged "the NBA Defendants and DirecTV have, *in reality*, agreed to fix prices at artificially high and non-competitive rates." (Plts' Oppo. to NBA Defs' Mtn. to Dismiss FAC at 13 & n. 17; Plts' Oppo. to DirecTV's Mtn. to Dismiss FAC at 8.)

Having carefully reviewed the FAC, the Court finds it fails to state a claim for vertical price fixing. This Court's June 18, 2001 Order and applicable pleading standards do not require the Plaintiffs to plead detailed evidentiary facts in support of their claims. Rather, the facts alleged must be sufficient to describe an agreement to fix prices. *See Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 507–08 (9th Cir.1989) (stating that a plaintiff "must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail"); *Rutman*, 829 F.2d at 736 (stating a complaint must at least "outline or adumbrate a violation of the Sherman Act") (internal quotations omitted). Contrary to Plaintiffs' assertion, conclusory statements that defendants violated antitrust laws are insufficient. "Although the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant antitrust language to state a claim for relief." *TV Communications*, 964 F.2d at 1024. Rather, "[a] plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *Id. Program Eng'g*, which predates *Rutman*, should not be read to relax the pleading standard. In the portion of *Program Eng'g* that Plaintiffs quote from, the Ninth Circuit was reviewing whether the district court properly granted summary judgment in favor of the appellees when discovery had been limited to whether any overt act had been committed pursuant to the alleged conspiracy during a specific time period. *Program Eng'g*, 634 F.2d at 1192–94. The appellants argued the discovery order should be construed to mean that assuming there was a conspiracy, did any overt act occur during the limitation period. *Id.* at 1193. In the passage Plaintiffs quote from, the court stated that "[t]he allegations of conspiracy in the complaint *are mostly* mere conclusory statements, enough to survive a motion to dismiss, but not enough to support the suggested construction of the district court's discovery order." *Id.* (emphasis added). Accordingly, contrary to Plaintiffs' assertion, *Program Eng'g* did not suggest that an antitrust complaint can

survive a motion to dismiss with only conclusory statements. Indeed, earlier in the opinion the court reviewed the district court's order granting a Rule 12(b)(6) motion as to one of the plaintiffs for lack of standing. *Id.* at 1191–92. In upholding the district court's order, the Ninth Circuit pointed out the lack of factual allegations demonstrating the plaintiff had standing to sue. *Id.*

Other than alleging the existence of an unlawful agreement to fix prices at artificially high levels—an allegation too conclusory to maintain a Section 1 claim—the only facts alleged in the FAC to support such an agreement are contained in paragraph 76(d). That paragraph states that the Defendants used "a vertical price-fixing scheme setting minimum prices ('Deemed Prices') which Deemed Prices have in reality been the prices charged to consumers." (FAC ¶ 76(d).) Although the FAC does not attach a copy of the NBA–DirecTV contract nor specifically cite to it, paragraph 76(d)'s discussion of "Deemed Prices" is a direct reference to the NBA–DirecTV contract, which this Court may consider on a motion to dismiss. *See Parrino,* 146 F.3d at 706 (holding that the court may consider "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint").

"Deemed Prices," as discussed in the NBA–DirecTV contract, are for purposes of calculating the minimum royalty that DirecTV pays to the NBA. (Mishkin Decl. Exh. A–19 to A–24; Williams Decl. Exh. A at 18–23.) As to residential consumers, the contract provides:

DIRECTV shall have the right, in its sole discretion, to set the price of the Service for Residential Consumers. Notwithstanding DIRECTV's right to determine such price(s), DIRECTV shall account to the NBA for the purposes of Residential Gross Receipts (as defined below in Section 2(a)(i)) on the basis of the higher of (x) the actual sales price to the Residential Service Subscriber, or (y) a "deemed" sales price (*"Residential Deemed Price"*), in both cases, net of taxes and other charges pursuant to Section 2(a)(i). The Residential Deemed Price with respect to each of the packages set forth below shall equal the following:

. . . . .

Notwithstanding the foregoing, the NBA agrees to consider in good faith adjustments to the various Residential Deemed Prices set out above as necessary to conform to changes in market factors.

(Mishkin Decl. Exh. A–19, A–21; Williams Decl. Exh. A at 18, 20.) The contract similarly states that for commercial establishments:

DIRECTV shall have the right, in its sole discretion, to set the price of the Service for Commercial Establishments. Notwithstanding DIRECTV's right to determine such price(s), DIRECTV shall account to the NBA for the purpose of Commercial Gross Receipts (as defined in Section 2(a)(ii) below) on the basis of the higher of (x) the actual sales price to the Commercial Service Subscriber or (y) a "deemed" sales price (*"Commercial Deemed Price"*), in both cases, net of taxes, and other charges pursuant to Section 2(a)(ii). The Commercial Deemed Prices with respect to the Half Season Package and the Full Season Package shall equal the following:

. . . . .

Notwithstanding the foregoing, the NBA agrees to consider in good faith adjustments to the various Commercial Deemed Prices set out above (including, without limitation, adjustments based on calculating the Commercial Deemed

Price on a per seat basis) as necessary to conform to changes in market factors. (Mishkin Decl. Exh. A–21 to A–22, A–24; Williams Decl. Exh. A at 20–21, 23.)

Therefore, the contract's Deemed Prices provision does not require DirecTV to sell the NBA League Pass for a specific price, but rather sets forth a formula to set a wholesale price that DirecTV must pay the NBA for each unit of the NBA League Pass. As such, according to Defendants, there is no price fixing under *General Cinema.* Plaintiffs respond that *General Cinema* is inapposite to this case.

In *General Cinema,* the plaintiff was an exhibitor of motion pictures to the public and defendant was a distributor of films produced by Walt Disney Productions. *General Cinema,* 681 F.2d at 595. Defendant earned its revenues by renting motion pictures to exhibitors under a license agreement. *Id.* Plaintiff challenged the system used by defendant to determine the amount of rent paid to defendant. *Id.* at 595–96. Under that system, an exhibitor such as the plaintiff was required to pay either (i) a stated percentage (*e.g.,* 70%) of each ticket sold, or (ii) the same percentage of a "minimum per capita amount" (minimum admission price) set in the license agreement, whichever was greater. *Id.* at 596. Plaintiff was free to set its own prices, although if it set prices below the minimum admission price, the rental fee due the defendant would be a higher proportion of the ticket price than if it charged the minimum admission price or higher. *Id.* at 596, 598. The Ninth Circuit affirmed the district court's order entering judgment on the pleadings, finding that the defendant's rental policy did not constitute vertical price fixing. *Id.* at 597–98. In so holding, the court noted the rental policy contained "no elements of coercion that might encourage exhibitors to set any price other than a competitive price." *Id.* at 597. The court could "see

no way in which the different percentage of ticket price that must be paid in film rental could possibly influence exhibitors to set a non-competitive ticket price." *Id.* Rather, the defendant's rental system did "no more to induce exhibitors to set prices at other than a competitive level than a system that charges a flat dollar rental." *Id.* at 598.

█ Plaintiffs attempt to distinguish *General Cinema* on its facts, arguing that consumers had any number of movie theaters to select from but that they can only obtain NBA out-of-market games through the NBA League Pass at a price fixed by the Defendants. This distinction is unpersuasive. The significance of *General Cinema* is that a contract giving a distributor discretion to set the price for product but requiring the distributor to pay the manufacturer a set percentage or minimum price as a royalty does not constitute price fixing. The contract at issue in this case therefore falls within *General Cinema.* DirecTV has the sole discretion to set the price of the NBA League Pass, but must pay the NBA a royalty calculated using the "Deemed Prices" provisions. That DirecTV has an alleged exclusive distributorship of the NBA League Pass does not render the contract violative of the Sherman Act as price fixing.

Further, Plaintiffs' contention that Defendants cannot hide behind the terms of the NBA–DirecTV contract is not persuasive. In their opposition, Plaintiffs maintain that notwithstanding the terms of the contract, the FAC alleges that in reality there was an agreement among the Defendants to fix prices. In support, Plaintiffs cite paragraphs 60, 75, 76, and 77. (Plts' Oppo. to NBA Defs' Mtn. to Dismiss FAC at 13 & n. 17; Plts' Oppo. to DirecTV's Mtn. to Dismiss FAC at 8.) Paragraphs 60 and 75 allege there was an agreement among the Defendants to, *inter alia,* fix

prices. (FAC ¶¶ 60, 75.) Paragraph 76 lists certain actions the Defendants took to effectuate their conspiracy and in relevant part, contains the above-discussed language regarding "Deemed Prices." (FAC ¶ 76(d).) Paragraph 77 lists the effects of the Defendants' conspiracy. (FAC ¶ 77.) None of these paragraphs nor any other portion of the FAC suggests that, notwithstanding the terms of the written NBA–DirecTV contract, there existed a separate conspiracy or contract pursuant to which the Defendants agreed to fix prices. Rather, the FAC's discussion of "Deemed Prices" suggests that the pleading is relying on the NBA–DirecTV written contract as the illegal agreement between the parties. Further, Plaintiffs cannot now add allegations that there existed an agreement among the Defendants separate from the written contract to survive the instant motion to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) ("The 'new' allegations contained in the [plaintiff's] opposition motion ... are irrelevant for Rule 12(b)(6) purposes.").

Accordingly, in light of the conclusory nature of the FAC's allegations and because the terms of the NBA–DirecTV contract show that the NBA Defendants did not attempt to fix the price of the NBA League Pass, the FAC fails to state a claim for vertical price fixing. *See General Cinema*, 681 F.2d at 597 (stating that vertical price fixing occurs when a supplier attempts to fix the prices charged by those who resell its products).

### B. Restricting Output Theory.

■ When dismissing Plaintiffs' original complaint, this Court found that because the pleading was unclear as to DirecTV's role in the alleged conspiracy, it failed to state a Section 1 claim based on restricting outputs. (June 18, 2001, Order at 16.) Accordingly, Plaintiffs were granted leave to amend these allegations. *Id.*

The FAC contends one of the terms of the Defendants' contract, combination, and conspiracy was to restrict the output of live video satellite and cable television broadcasts of NBA professional basketball games through non-exempt channels of distribution. (FAC ¶¶ 60, 75, 76(b).) To this end, the Defendants agreed to divide North America into exclusive geographic territories for the sale of satellite television broadcast rights to regular season NBA games. (FAC ¶¶ 54, 76(a).) The FAC alleges Defendants:

> agreed to "black out" the rebroadcast of certain NBA games to maintain "protected territories" of certain NBA Teams. Further, specifically with respect to NBA League Pass, these conspirators have also agreed to black out games publicly advertised as included in the NBA League Pass even when those games are outside of the above-referenced "protected territories."

(FAC ¶ 58.)

Defendants argue the FAC fails to state a claim based on restricting output because the "black out" provision relied on by Plaintiffs does not restrict output. Rather, the NBA–DirecTV contract provides that every NBA game that is "blacked out" is otherwise available via free local over-the-air broadcasts or via local and national cable channels. Accordingly, output has not been restricted. Second, Defendants maintain that the Plaintiffs have admitted that the NBA League Pass in fact increased rather than reduced output of live video broadcasts of NBA professional basketball games because before its creation, out-of-market games were unavailable to consumers. Plaintiffs respond that their allegations are sufficient, and the fact that the NBA League Pass increased output of "out-of-market" games compared to what existed prior to its development is irrelevant because the

NBA Defendants had been artificially suppressing output of out-of-market games. Rather, citing *National Collegiate*, Plaintiffs contend what matters is not whether the output is lower now that it was before, but whether it is lower than it would otherwise be.

The majority of the FAC's allegations regarding output restrictions are conclusory, and only differ from the original complaint in that they now state that DirecTV was involved in a conspiracy to restrict output. (*See* FAC ¶ 60 ("[t]he substantial terms of the continuing agreement and conspiracy among [all Defendants] was to ... restrict the output of[ ] video broadcasts of out-of-market NBA games"); FAC ¶ 76(b) (alleging Defendants "[a]greed, conspired, and/or contracted to restrict the output of the broadcasts of NBA professional basketball games in non-exempt channels of distribution (such as satellite broadcasting)").) The only factual allegations added in the FAC are those relating to "black outs." [6]

The Court agrees with Defendants that as alleged, the FAC fails to allege how the "black outs" could restrict output. The NBA–DirecTV contract provides that the only time a game is "blacked out" on the NBA League Pass is because it is otherwise available to view on a free local over-the-air broadcast or via local and national channels. (Mishkin Decl. Exh. A–15;

Williams Decl. Exh. A at 14.) Specifically, the NBA–DirecTV contract states that:

1(d) ...

(ii) ... DIRECTV shall have no right under this Agreement to distribute a live telecast or retelecast of any NBA playoff game. No games telecast by NBC, TNT or TBS will be made available to DIRECTV or to any Other Distributor, except as those entities may permit such distribution (including by means of HDTV) by separate agreement or via compulsory copyright license or the like; *provided, however*, that, notwithstanding any such separate agreement, DIRECTV will cause the "blackout" within thirty-five (35) miles from the home team's city of operations of all games telecast on TNT and TBS, and those WGN telecasts that are licensed for national distribution by the NBA will be deemed OTA NBA Games [7] for purposes of the second sentence of Section 1(d)(iii) below and will be "blacked out" by DIRECTV pursuant to any applicable rules of the Federal Communications Commission (e.g., 47 C.F.R. 76.67).

(iii) For each RSN NBA Game [8] carried by DIRECTV, Service Subscribers in the Home Market of each participating NBA team and Service Subscribers within the area extending from the Home Market to the boundary created

---

6. Insofar as Plaintiffs now contend that they have properly alleged a theory of output restrictions because satellite users must purchase the NBA League Pass on an all-or-nothing basis, that theory fails because Plaintiffs waived this argument in their opposition to DirecTV's motion to dismiss the original complaint where they stated they were not alleging the bundled nature of the NBA League Pass is an illegal tying arrangement. (Plts' Oppo to DirecTV's Mtn. to Dismiss Complaint or in the Alternative, to Compel Arbitration at 4–5 (arguing that their claim is for price fixing and not based on a tying theory).)

7. NBA OTA Games "are defined as and include all NBA Games (other than playoff games) licensed by a team for distribution by broadcast television." (Mishkin Decl. Exh. A–14; Williams Decl. Exh. A at 13.)

8. RSN NBA Games "are defined as and include NBA Games (other than playoff games) licensed by a team for distribution by non-broadcast television technology." (Mishkin Decl. Exh. A–14; Williams Decl. Exh. A at 13.)

by the area within 150 miles of the corporate or unincorporated limits of the city ... of operation of each participating team and as otherwise specified by the NBA in conformance with the NBA's rules ("*RSN Market(s)*"), shall not be knowingly authorized by DIRECTV to receive such NBA Games unless DIRECTV provides such NBA Games to Service Subscribers in either team's RSN Market pursuant to Section 1(a)(iii)[9] or Section 1(h).[10] For each OTA NBA Game carried by DIRECTV, Service Subscribers (A) in the Home Market of each participating NBA team, and (B) within the Grade–B Contour of the City in which an over-the-air network affiliated licensed by a participating team is located (collectively, the "*OTA Market(s)*"), shall not be knowingly authorized by DIRECTV to receive such NBA Games. In the event that a participating team has not authorized the local telecast in its Home Market of a particular NBA Game by any means of distribution technology, DIRECTV shall not knowingly authorize any Service Subscribers in the Home Market of such team to receive such NBA Game.

(Mishkin Decl. Exh. A–15; Williams Decl. Exh. A at 14.) These provisions therefore

only black-out games that are televised by the NBA League's national over-the-air broadcast network (NBC) and all games televised by its national cable carriers (TBS and TNT), thus protecting the exclusivity granted to those stations. They further provide that DirecTV is to refrain from distributing within the home market of an NBA team any game that has already been licensed to a local telecaster or cablecaster for telecast within the team's home market, except where DirecTV has been authorized to televise the game as part of DirecTV's carriage of a regional sports network. Accordingly, the NBA League Pass's black-out provision does not restrict output; it only affects what channel the game is available on. *See Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (noting that "[i]f the league arranges for the broadcast of every game (or if the clubs may broadcast every game the league does not), there is no reduction in output.").

Further, the Court finds Plaintiffs' reliance on *National Collegiate* unpersuasive. There, the National Collegiate Athletic Association ("NCAA") adopted a plan for televising college football games of its member institutions. *National Collegiate*,

9. Section 1(a)(iii) of the contract states that DirecTV is authorized, as part of DirecTV's regular carriage of the programming of any regional sports network ("RSN") "pursuant to DIRECTV's agreement with such RSN, to deliver any NBA Games distributed by such RSN in the applicable Home Market ... or, where applicable, the RSN market of the NBA team with which such RSN has a then-current television license agreement." (Mishkin Decl. Exh. A–7; Williams Decl. Exh. A at 6.) DirecTV is also authorized to distribute to its subscribers who are authorized to receive the programming of an RSN, retelecasts of regular season NBA Games that are distributed by such RSN as part of that RSN's regularly scheduled programming in the applicable Home Market. (Mishkin Decl. Exh. A–7; Williams Decl. Exh. A at 6.)

10. Section 1(h) of the contract provides that "[w]ith respect to any NBA team that, for any reason, does not distribute telecasts of NBA games in which it participates via an RSN within its Home Market, and that desires to distribute some of such NBA Games via DIRECTV within its Home Market, DIRECTV shall in good faith consider making available to such team a distribution package of such team's NBA Games to DIRECTV Subscribers located in that team's Home Market or, at NBA's sole discretion, to Subscribers located in that team's RSN Market, subject in either instance to then-current NBA rules regarding game telecast distribution and the terms of Section 1(d)(iii) above ....'" (Mishkin Decl. Exh. A–34; Williams Decl. Exh. A at 33.)

468 U.S. at 90–91, 104 S.Ct. 2948. The plan stated its purpose was to reduce the adverse effect of live television upon football game attendance. *Id.* at 91, 104 S.Ct. 2948. To that end, the plan limited the total amount of televised intercollegiate football games and the number of games that any one college could televise, and prohibited any member of the NCAA from selling television rights except in accordance with the plan. *Id.* at 91–94, 104 S.Ct. 2948. The plaintiffs were members of the NCAA as well as the College Football Association ("CFA"), which was organized to promote the interests of major football-playing colleges within the NCAA. *Id.* at 89, 94, 104 S.Ct. 2948. CFA members felt they should have a greater voice in the formation of football television policy, and negotiated a contract with the National Broadcasting Company ("NBC") that would have allowed a more liberal number of television appearances for each college and would have increased the revenues realized by CFA members. *Id.* at 94–95, 104 S.Ct. 2948. In response, the NCAA publicly announced it would take disciplinary action against any CFA member that complied with the CFA–NBC contract. *Id.* at 95, 104 S.Ct. 2948. The plaintiffs filed an action and obtained a preliminary injunction preventing the NCAA from initiating disciplinary proceedings or otherwise interfering with CFA's efforts to perform its agreement with NBC. *Id.* After a full trial, the district court found that competition in the relevant market—defined as "live college football television"—had been restrained in part because the plan placed an artificial limit on the production of televised college football. *Id.* at 95–96, 104 S.Ct. 2948. The Court of Appeals held that the NCAA television plan constituted illegal *per se* price fixing. *Id.* at 97, 104 S.Ct. 2948. The United States Supreme Court found that NCAA's plan restricted output by limiting the quantity of television rights for

sale. *Id.* at 99, 104 S.Ct. 2948. Analyzing the plan as a horizontal output restriction, the Court found that the record supported the district court's conclusion that the plan violated the Sherman Act by curtailing output and blunting the ability of member institutions to respond to consumer preference. *Id.* at 120, 104 S.Ct. 2948.

*National Collegiate* noted that one of the anticompetitive consequences of the NCAA plan is that output was lower than it would otherwise be. *Id.* at 107, 104 S.Ct. 2948. Plaintiffs' opposition cites this language, arguing that because of the NBA League Pass, output of NBA games is lower than it would otherwise be. The allegations of the FAC, however, undermine this contention and distinguish it from the facts presented in *NCAA*. In particular, the FAC alleges that prior to the 1994–95 season, with few specified exceptions, out-of-market games were not available to the public. (*See* FAC ¶ 54 (stating that an agreement among the NBA and NBA Teams "forbade the broadcast of any NBA game in any geographic market except those licensed by the NBA Team in that geographic market 'out-of-market games' ").) In contrast to the plan in *NCAA* which limited the number of broadcasts permitted, beginning in the 1994–95 season, the NBA League Pass has made available for purchase "up to forty out-of-market regular season NBA games per week and more than 1000 regular season games per year." (FAC ¶ 56.) Accordingly, output of out-of-market NBA games increased by virtue of the NBA League Pass, rather than decreased.

■ Insofar as Plaintiffs contend that output of out-of-market games could be increased if satellite users were not required to purchase the entire NBA League Pass on an all-or nothing basis, Plaintiffs have already waived this argument in their opposition to DirecTV's motion to dismiss

the original complaint where they stated they were not alleging the bundled nature of the NBA League Pass is an illegal tying arrangement. (Plts' Oppo. to DirecTV's Mtn. to Dismiss Complaint or in the Alternative to Compel Arbitration at 4–5 (arguing that they alleged a price fixing scheme and were not relying on a tying theory).) Further, Plaintiffs have not cited, nor is the Court aware of, any authority indicating that when a defendant offers a new product in a competitive manner (*e.g.,* all out-of-market games via the NBA League Pass), a party can allege a Section 1 violation on the basis the product is not being offered in the manner the plaintiffs would prefer (out-of-market games in a non-bundled format). Antitrust laws are to ensure competition is not unlawfully harmed; economic market forces will dictate whether the product will be successful.

Finally, Plaintiffs' contention that prior to the 1994–95 season the NBA Defendants artificially suppressed output is irrelevant to the issue of whether the NBA League Pass *itself* reduced output. Indeed, the FAC acknowledges that the NBA Defendants' agreements regarding broadcasts were made pursuant to the SBA. (FAC ¶¶ 53–54.)

Accordingly, because the FAC's allegations regarding output restrictions are conclusory and unsupported by factual allegations, this Section 1 theory fails to state a claim.

## C. Exclusive Distributorship Theory.

■ This Court's June 18, 2001, Order found that insofar as the original complaint relied on an exclusive distributorship theory, its allegations were insufficient to state a claim because Plaintiffs had not alleged any facts demonstrating an intent to harm competition or antitrust injury. (June 18, 2001, Order at 16–17.) The FAC also relies on an exclusive distributorship in alleging a Section 1 violation. In particular, Plaintiffs maintain the NBA Defendants and DirecTV have established an exclusive distributorship at the exclusion of Echostar that adversely affects competition and eliminates the possibility of a competitive product. (FAC ¶¶ 64, 76(e)-(f), 77(d).)

Defendants argue these allegations should be dismissed because Plaintiffs have not satisfied this Court's order or Ninth Circuit pleading requirements that Plaintiffs allege specific intent to harm competition and anticompetitive conduct from which such specific intent may be inferred. Defendants further argue that even if the Plaintiffs had alleged sufficient facts, they have admitted that DirecTV did not have an exclusive distributorship for the NBA League Pass. As alleged in the FAC, in Demand was also authorized to distribute the NBA League Pass to cable television subscribers.

Plaintiffs respond that they are not required to plead or prove intent to harm; rather, an antitrust violation occurs if the exclusive agreement is intended to or actually does harm competition in the relevant market. According to Plaintiffs, they have properly alleged that the NBA–DirecTV contract excludes DirecTV's competitor, Echostar, and that DirecTV "devoured its competitor PrimeStar" to become the exclusive distributor and obtain a dominant market position. Plaintiffs further argue that the NBA League Pass is the exclusive means by which out-of-market games may be licensed for satellite viewing by consumers, whether at home or at commercial establishments.

■ "[A]n agreement between a manufacturer and a distributor to establish an exclusive distributorship is not, standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect competition in the market." *Rutman,* 829 F.2d at 735. For an antitrust violation

to occur, the exclusive agreement must intend to or actually harm competition in the relevant market. *Id.; Electronics Communications, Corp.*, 129 F.3d at 243–46.

The FAC alleges that the Defendants created this exclusive distributorship for the purpose of artificially raising and fixing prices and reducing and restricting output. (FAC ¶¶ 65, 77(a)-(c).) Insofar as these allegations suggest intent to harm competition, they are conclusory and insufficient to withstand a motion to dismiss. *See Rutman*, 829 F.2d at 735. As discussed above, the FAC's allegations that Defendants engaged in anticompetitive vertical price fixing and output restrictions are conclusory and fail to state a claim. Further, Plaintiffs' oppositions to the motions to dismiss contend they are not required to allege intent to harm competition, indicating they are relying on their allegations that the NBA–DirecTV exclusive distributorship has in fact harmed competition.

■■■■ The FAC's allegations regarding actual harm to competition are insufficient. First, the FAC's allegation that DirecTV "devoured" PrimeStar to become the exclusive distributor is irrelevant and not a sufficient factual allegation to support Plaintiffs' contention the NBA–DirecTV agreement is anticompetitive. A manufacturer can terminate distributors and agree to an exclusive distributorship without implicating Section 1. *Rutman*, 829 F.2d at 735. Further, such termination does not create an inference that harm to competition was intended. *Id.* at 736. It would seem to follow then that a distributor can purchase another distributor and thereby become the exclusive distributor of a product without running afoul of Section 1. Plaintiffs have presented no authority suggesting otherwise.

Second, the FAC alleges Defendants "[a]greed, conspired, and/or contracted to distribute [the NBA League Pass] to satellite dish owners/users on an exclusive basis through DirecTV, thereby limiting and restricting competition at the consumer level," as consumers have been deprived of the benefit of free and open competition among satellite television providers. (FAC ¶¶ 76(e), 77(d).) The FAC further alleges that no other satellite provider, such as Echostar, is authorized to provide NBA League Pass games. (FAC ¶¶ 64, 76(f).) These allegations are bare legal conclusions and insufficient to withstand a motion to dismiss. *See Rutman*, 829 F.2d at 735. Further, the fact that other satellite providers such as Echostar are not authorized to broadcast the NBA League Pass does not, standing alone, properly allege a violation of antitrust laws. *See id.* (stating that "an exclusive distributorship is not, standing alone, a violation of antitrust laws"); *A.H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1306 (9th Cir. 1981) ("Manufacturers therefore may grant exclusive dealerships, and even cut off an existing dealer in order to do so."). To so hold would mean that exclusive distributorships would be a *per se* violation of Section 1.

Plaintiffs contend that *Rutman* is inapplicable because the facts in the two cases are different. First, Plaintiffs argue that the NBA as a whole, rather than the 29 individual teams, selected DirecTV as the satellite distributor of NBA League Pass. Plaintiffs further argue that *Rutman* is inapposite because this case is price related. Plaintiffs cite no authority to support their claim these facts render *Rutman*'s pleading requirements inapplicable. The Court finds that *Rutman*'s discussion of the necessary allegations to state an antitrust claim provide the legal framework for analyzing Plaintiffs' claims. Further, although Plaintiffs have alleged a vertical price fixing claim, they have also alleged antitrust violations based on an exclusive

distributorship, and those allegations must be analyzed on their own merits.

Accordingly, the FAC's allegations that the NBA–DirecTV distributorship violates Section 1 are conclusory and do not pass muster under *Rutman,* and therefore are dismissed.[11]

### D. NBA Defendants' Horizontal Conspiracy.

The FAC alleges the NBA Defendants engaged in a horizontal conspiracy to divide the market and fix prices whereby each of the separately owned and operated NBA teams retains the right to license and broadcast the majority of its games within its designated home territory, but assigns the right to license its games outside of its designated home territories to a single seller. Plaintiff also argues that each NBA team agrees to forego any sale or broadcasting of its games into another club's designated territory. Absent these agreements, Plaintiffs maintain rival clubs would compete with one another and offer their out-of-market game broadcasts to consumers, placing downward pressure on the price of the NBA League Pass and result in increased output and another competitive choice for consumers. The NBA Defendants challenge Plaintiffs' horizontal conspiracy allegations, arguing that because Plaintiffs are indirect purchasers of the NBA League Pass, they do not have standing to bring this claim and second, they also lack standing because any claimed actual or threatened injury is remote and indirect and not proximately caused by the alleged conspiracy.

### 1. Plaintiffs' Standing Under Section 4 of the Clayton Act.

Plaintiffs, as private individuals, are seeking to enforce Section 1 of the Sherman Act and obtain damages against the Defendants pursuant to Section 4 of the Clayton Act. (*See* FAC ¶ 41.) Section 4 of the Clayton Act authorizes private suits to recover damages for violations of the Sherman Act: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a); *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir. 2000); *Garabet v. Autonomous Techs. Corp.,* 116 F.Supp.2d 1159, 1166 (C.D.Cal. 2000). The Ninth Circuit has explained that "[d]espite the apparent breadth of the phrase 'any person,' the Supreme Court has held that Congress did not intend to afford a remedy to everyone injured by an antitrust violation simply on a showing of causation." *Knevelbaard,* 232 F.3d at 987. Instead, the plaintiff must have "antitrust standing." *Id.* In determining whether a plaintiff has antitrust standing, courts "must 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" *Id.* (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). The Ninth Circuit has summarized the relevant factors as follows: "'(1) the nature of the plaintiff's alleged injury; that is, whether

---

**11.** It is further questionable whether the NBA–DirecTV distributorship is in fact exclusive in light of the FAC's allegations that NBA has also contracted with iN Demand to provide the NBA League Pass to cable subscribers on a pay-per-view basis. (*See* FAC ¶ 66.) Plaintiffs argue that the relevant market is the NBA League Pass for satellite viewing, and that there is no real competition between satellite and cable. Because the FAC's allegations are conclusory, it is unnecessary for this Court to determine whether the availability of the NBA League Pass through cable renders the NBA–DirecTV contract non-exclusive.

it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.'" *Id.* (*quoting American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054–55 (9th Cir.1999)).

The Supreme Court analyzed Section 4 of the Clayton Act in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The Court held that an indirect or remote purchaser lacks standing to seek damages against the manufacturer for alleged violations of federal antitrust laws. *Illinois Brick*, 431 U.S. at 728–29, 737–47, 97 S.Ct. 2061. This rule "serves to avoid the complications of apportioning overcharges between direct and indirect purchasers and to eliminate multiple recoveries." *Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir.1998); *Illinois Brick*, 431 U.S. at 737–47, 97 S.Ct. 2061. In addition, the *Illinois Brick* bar ensures antitrust laws are enforced by those purchasers who have been most directly injured by the antitrust violation. *Illinois Brick*, 431 U.S. at 731, 97 S.Ct. 2061.

Plaintiffs allege the NBA Defendants engaged in a horizontal market division and price fixing scheme pursuant to which they created the NBA League Pass. (FAC ¶¶ 54–56.) The FAC also alleges that DirecTV and iN Demand are distributors of the NBA League Pass. (FAC ¶¶ 63, 66.) The FAC alleges that Plaintiffs purchased the NBA League Pass from DirecTV and iN Demand. (FAC ¶¶ 21, 22, 32, 33.) Plaintiffs, therefore, are indirect purchasers of the NBA League Pass, and the *Illinois Brick* rule may bar their Sherman Act claim for a horizontal conspiracy by the NBA Defendants. In opposing the NBA Defendants' motion, Plaintiffs rely on the "co-conspirator" exception to *Illinois Brick*, which states that

the bar against indirect purchasers is "inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediaries in the distribution chain to fix the price at which the plaintiffs purchased." *State of Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 n. 2 (9th Cir.1984).

In analyzing whether Plaintiffs fall within the co-conspirator exception, the Court must be mindful that any exception to the *Illinois Brick* rule is to be construed narrowly. *See Illinois Brick*, 431 U.S. at 745, 97 S.Ct. 2061. Plaintiffs' allegations of a vertical conspiracy between the NBA Defendants and DirecTV are conclusory for the reasons discussed above. Further, insofar as Plaintiffs allege the NBA Defendants conspired with iN Demand, those allegations are also insufficient to put this case within the "co-conspirator" exception. In allegations that parallel those regarding the NBA–DirecTV contract, Plaintiffs contend the NBA Defendants and iN Demand conspired to provide the NBA League Pass to residential cable subscribers at artificially inflated and fixed levels, restrict output, and engage in an unlawful exclusive distributorship. (FAC ¶¶ 66–71, 80–87.) Thus, those allegations are equally conclusory and fail to allege sufficient facts to support a vertical conspiracy theory.

Further, DirecTV and iN Demand could not engage in horizontal conspiracy with the NBA Defendants. Horizontal price fixing occurs when competitors agree to set prices and thereby interfere with free market forces. *See Business Elecs.*, 485 U.S. at 730, 108 S.Ct. 1515 ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."). As alleged in the FAC, DirecTV is "a provider of high pow-

er direct broadcast satellite service," (FAC ¶ 19), and iN Demand "provides 'pay-per-view' programming to cable companies and their subscribers nationwide." (FAC ¶ 66.) The NBA Defendants, in contrast, govern and participate in a professional basketball league. (FAC ¶¶ 48–50.) Accordingly, the NBA Defendants are not competitors with DirecTV and iN Demand and therefore cannot engage in a horizontal conspiracy.

### 2. Plaintiffs' Standing Under Clayton Act Section 16.

 Plaintiffs allege their horizontal conspiracy claim against the NBA Defendants is also viable and not barred by *Illinois Brick* because they can seek injunctive relief.[12] Plaintiffs are correct. Section 16 of the Clayton Act allows a private party to obtain an injunction for a violation of the Sherman Act: "any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damages by a violation of the antitrust laws." 15 U.S.C. § 26. To meet the standing requirements under this section of the Clayton Act, a plaintiff:

> must generally meet all the requirements that apply to the damages plaintiff, except that the injury itself need only be threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction.

*Lucas*, 140 F.3d at 1234; *Garabet*, 116 F.Supp.2d at 1170. "However, a plaintiff must still demonstrate that injunctive relief is necessary to prevent injury to its interests rather than those of others." *Garabet*, 116 F.Supp.2d at 1170.

Plaintiffs argue they have been injured not only by the artificially high prices, "but by the artificial suppression of consumer choice inherent in the conspiracies at issue." (Plt's Oppo. to NBA Defs' Mtn to Dismiss FAC at 19.) According to Plaintiffs, "[a]bsent the agreed upon market division scheme, consumers would be able to select packages of out-of-market games other than the expensive all-encompassing 'NBA League Pass.'" *Id.* Insofar as Plaintiffs contend that they have been injured by the price of the NBA League Pass, as discussed above in Section II.A., the NBA–DirecTV contract provides that DirecTV sets the price of the NBA League Pass. Further, the allegations in the FAC are conclusory as to the NBA Defendants' purported role in setting those prices. Accordingly, there is no actual or threatened injury to the Plaintiffs as a result of the NBA Defendants' alleged horizontal conspiracy.

Second, to the extent Plaintiffs now contend they have been injured by their inability to select packages of out-of-market games other than the NBA League Pass, that argument is essentially that the NBA League Pass as a bundled package is an illegal tying arrangement. However, as noted above, Plaintiffs have already waived this argument in their opposition to DirecTV's motion to dismiss the original complaint where they stated they were not alleging the bundled nature of the NBA League Pass is an illegal tying arrangement. (Plts' Oppo. to DirecTV's Mtn. to Dismiss Complaint or in the Alternative, to Compel Arbitration at 4–5 (arguing that they alleged a price fixing scheme and were not relying on a tying theory).) Accordingly, this argument fails to show

---

12. Plaintiffs also argue that a third exception to *Illinois Brick* is a state law remedy. Plaintiffs are correct. *California v. ARC America*, 490 U.S. 93, 101–02, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). However, this exception is relevant only to Plaintiffs' state law causes of action, and do not support a horizontal conspiracy claim against the NBA Defendants under the Sherman Act.

Plaintiffs have properly plead a threatened injury caused by the alleged violation.

### III. *Remaining State Law Claims.*

Because the Court grants Defendants' motions to dismiss Plaintiffs' Sherman Act claims, which formed the basis for the Court's jurisdiction over this case, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law causes of action and hereby **DISMISS-ES** Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c) (court may decline to exercise supplemental jurisdiction over state law claims where it has dismissed the claims on which its original jurisdiction was based).

### *CONCLUSION*

For the foregoing reasons, having carefully considered the parties' briefs, applicable law, and good cause appearing, **IT IS HEREBY ORDERED**:

1. DirecTV's motion to dismiss is **GRANTED**.

2. NBA Defendants' motion to dismiss is **GRANTED**.

3. The first and second causes of action for violation of Section 1 of the Sherman Antitrust Act are **DISMISSED WITH PREJUDICE**.

4. The remaining state law claims under the Cartwright Act and California's Unfair Competition Act are **DISMISSED** under 28 U.S.C. § 1326 and **WITHOUT PREJUDICE** to being re-filed in state court.

**IT IS SO ORDERED.**